THE ATCHISON, TOPEKA AND SANTA FE RAIL-
WAY COMPANY and GULF COLORADO and SANTA
FE RAILWAY COMPANY, Plaintiffs-In-Error, v. AR-
THUR ORTIZ and ARTHUR ORTIZ, JR., d/b/a AR-
THUR ORTIZ & SON, Defendants-In-Error.
—361 S. W. (2d) 113.

Western Section. March 23, 1962.

Certiorari Denied by Supreme Court October 4, 1962.

318

Jesse E. Johnson, Jr., Memphis, of counsel. Burch, Porter & Johnson, Memphis, for plaintiffs in error.

Newton P. Allen, Memphis, of counsel.

Armstrong, McCadden, Allen, Braden & Goodman, Memphis, for defendants in error.

AVERY, P. J. (W. S.) The parties are referred to in the briefs as "Appellants" and "Appellees" but from a court of law they are more generally referred to in this Court as Plaintiffs-In-Error and Defendants-In-Error.

The case comes to this Court from the law court of Shelby County, Division II, the Honorable John W. Wilson, Judge. It is brought to this Court by the original defendants in the lower Court, and unless these companies are referred to individually by the specific name, they will be referred to herein with the same status they had in the lower court, "defendants", and the plaintiffs in the lower court, unless referred to by name or by partnership name, will be referred to as "plaintiffs".

All parties to this suit are non-residents of the State of Tennessee and the defendants are not domesticated corporate entities in Tennessee. The declaration alleges that the defendants are non-resident corporations of the State of Tennessee, "having an office and agency in Shelby County, Tennessee, located in the Shrine Building, Memphis, Tennessee, and said corporations are engaged in doing business in Shelby County, Tennessee." It alleges the defendants at all times necessary in connection with the matters herein contained are common carriers for hire of both freight and passengers.

The suit is for damages alleged to have been the result of fire to 88 bales of cotton marked "RTCO (1517-Cotton)" weighing 43,749 lbs. and 9 bales of cotton marked "PIMA" weighing 5,314 lbs. Except where necessary to designate the different classes of the cotton, it will be referred to hereinafter as "the 97 bales of cotton involved."

The declaration is in three counts. It alleges that defendants had and maintained an office and agency in Shelby County, Tennessee, in the Shrine Building and engaged in doing business in Shelby County, Tennessee.

Count No. One alleges on or about May 28, 1959, the plaintiffs shipped the 97 bales of cotton by bill of lading No. 3032 after delivering same to the defendants at Las Cruces, New Mexico to be shipped to the plaintiffs at Houston, Texas, and it alleges failure of delivery in accord with contract or bill of lading resulting in $16,295.85 compensatory damages plus interest.

The second count of the declaration adopts all material averments of the first count and alleges violation of and liability under Section 20, paragraph 11, Title 49 United

States Code, which is known as the Carmack amendment to the Interstate Commerce Act. The damage sought to be recovered in accord with count two is the same as set out in count one.

Count three adopts the relevant allegations in said count one and alleges that at a point near Brownwood, Texas the defendants negligently and carelessly operated and controlled their trains, engines etc, and the cotton caught fire and that they were negligent in failing to extinguish the fire, and is a general charge of negligence in the handling of the cotton while in possession of said carriers, and avers the same amount as damage set forth in count one.

Summons was served by the Sheriff of Shelby County on the defendants "by reading writ to Mr. Michael M. Benya as District Agent, and leaving a copy of the bill with him."

Pleas in abatement were first filed by both the defendants. This plea attacks the jurisdiction of the Court on the theory that the defendants being non-resident corporate entities of the State of Tennessee, are not doing business in the State as to bring them within the jurisdiction of the State Courts. It alleges that the summons is invalid and void for reasons set out in the plea which is considered proper to aver in order to show that the defendants are not subject to process in this State. It, in short, avers that it has no office in Tennessee nor agent in Tennessee nor does any business in Tennessee and that the alleged agent, M. M. Benya on whom the process was served, is not an agent of the defendants which makes them subject to process and suit in this State under our

statutes. Reasons alleged for that averment are condensed as follows:

"That M. M. Benya is merely a soliciting agent of the defendants; * * * that his duties are traveling and soliciting shippers and patrons to route freight and, on some occasions, to purchase tickets for passage via the lines of The Atchison, Topeka and Santa Fe Railway Company and Gulf, Colorado and Santa Fe Railway Company and other affiliated companies which comprise The Atchison, Topeka and Santa Fe Railway System * * *. That the said M. M. Benya makes no contracts for the defendants * * * but does on occasions issue an exchange bill of lading, which is especially marked as such, such exchange bills of lading being issued only when a shipment is physically present in other states on rails of * * *"

The defendants have no property of any character in Tennessee nor in Memphis, Shelby County:

"* * * except the office furniture and equipment located in the office of The Santa Fe System at 870 Shrine Building, Memphis, Tennessee; * * * that the lease for the office space in room 870 in said Shrine Building was signed on behalf of The Atchison, Topeka and Santa Fe Railway Company by officials of said company located in Chicago, Illinois; that the payroll for the said M. M. Benya and his clerk is made up in St. Louis, Missouri, and salary checks are issued to the said two employees from Topeka, Kansas, said salary checks being issued by The Atchison, Topeka and Santa Fe Railway Company; that only two employees work in or out of the solicitation office maintained in room 870, Shrine

Building, Memphis, Tennessee, such employees being the said M. M. Benya and his clerk; that as an incident to solicitation of freight and passenger business, as aforesaid, the said M. M. Benya and his clerk write letters to patrons and prospective patrons on stationery bearing the trade name, The Atchison, Topeka and Santa Fe Railway System or bearing the name, The Atchison, Topeka and Santa Fe Railway Company; that as a further incident to solicitation, M. M. Benya or his clerk will write letters to various offices of The Atchison, Topeka and Santa Fe Railway Company or to its affiliated companies, tracing shipments and passing on to shippers the information obtained as a result of such inquiry; * * * that neither of said companies transact any business in Shelby County, Tennessee, other than that of mere solicitations, as above set out * * *''

This plea then avers that the service is void in the following manner:

"That the service of process as attempted in this cause is in violation of the due process and the commerce clauses of the Constitution of the United States in that personal service may not be obtained on a mere solicitation agent under such circumstances and that such attempted service unreasonably interferes with the maintenance of proper and adequate transportation service at reasonable cost."

The plea then prays the judgment of the Court thereon. It is properly signed by all counsel and sworn to as required by the laws of the State of Tennessee.

324

The plaintiffs filed a demurrer to that plea in abatement and the averments of that demurrer, such as are necessary, are as follows:

"Assuming for the purpose of this demurrer that the facts alleged in said plea in abatement are all true, the plea nevertheless does not show a substantial cause of defense, but to the contrary shows that both defendant railway companies are subject to service of process in this cause in this Court, and that this Court does have jurisdiction of both of said defendants, and that the summons and declaration herein should not be abated, quashed or dismissed."

It then prays for the dismissal of the plea, and that defendants be required to file pleas on the merits.

Hearing on the demurrer was seasonably had and the Court sustained said demurrer saying:

"The defendants' Plea in Abatement be and hereby is overruled.

"The defendants are allowed ten days in which to file their pleas to the merits of the cause."

The defendants saved exceptions to the action of the Court in sustaining the demurrer to their plea in abatement and then filed a simple general issue plea to counts one and two of the declaration, saying that they did not promise or agree as alleged therein; and plea of not guilty to the third count of the declaration saying that they are not guilty of the wrongs as alleged by plaintiff in that count.

They later filed Special Pleas. In these special pleas they admit they are common carriers and that they main-

tain an office in Memphis, Shelby County, Tennessee, but denying conduct of such business in Tennessee as justifies service of process on them by service of summons on Benya and thereby requiring them to litigate in the Courts of Tennessee; they say they are a foreign corporation and that the facts alleged in their pleas are true; they do not admit but demand strict proof of the fact that the plaintiffs are the owners of the cotton described in the declaration. They admit this cotton of 97 bales was delivered to the defendants as set forth in the declaration or at the point set out therein, and that the cotton was not delivered to the plaintiff at Houston, Texas, or elsewhere in the same condition that it was in when it was received for shipment, and deny all liability to plaintiffs, but particularly to the extent of $16,295.85 as alleged in the original demand; they admit that the statute codified in Title 49 U. S. Code sec. 20(11) is correctly set out in count two of the declaration, but they also deny that the plaintiffs have been damaged to the extent of $16,295.85, and that the total value of the cotton was only $12,953.26. They further aver the fire was a comparatively minor fire and that 76 bales of the cotton was untouched by any fire and deny all negligence alleged in the declaration on the part of the defendants in connection with the origin of the fire that damaged the cotton, and failure to use due diligence to extinguish it.

The pleas also set up Section 1(b) of the Bill of Lading contract as a defense to counts one and two of the declaration.

The case was tried before the Court without a jury, both on oral testimony and depositions as stipulated, and at the conclusion of all the proof, the Court found the value of the cotton to be $16,204.35 and that in addi-

tion thereto the plaintiffs were entitled to recover 6% per annum on said amount from June 2, 1959, the day it should have been delivered at destination to the date of the judgment, which interest is $1,752.66, or a total judgment of $17,957.01.

The judgment of the Court is dated March 20, 1961. Exceptions were saved, prayed, granted and perfected to this Court. Errors assigned are as follows:

## I.

"The Court erred in sustaining the plaintiffs' demurrer to the plea in abatement filed by the defendants, in which demurrer, the plaintiffs contend that both defendants were subject to service of process in this cause."

It then explains why such is error.

## II.

"The evidence preponderates against the judgment of the Court."

Then an explanation is made that the classification of the cotton is shown by the proof to be "barky, wasty, grassy or dusty before it was delivered to the defendants for transportation," with further explanation of why that fact is true as shown by the proof.

## III.

"The Court erred in allowing interest on the plaintiffs' claim from the date on which the shipment should have arrived at destination."

An explanation of that statement is made.

These assignments of error pose three questions:

"1—ARE THERE SUCH ADMISSIONS SET OUT IN THE PLEA IN ABATEMENT THAT SHOW THE DEFENDANTS TO HAVE BEEN CONDUCTING SUCH BUSINESS IN TENNESEE WHEN THE SUIT WAS INSTITUTED AND SUMMONS SERVED ON BENYA AS UNDER OUR LAW MAKES A FOREIGN CORPORATION AMENABLE TO THE JURISDICTION OF THE COURTS OF TENNESSEE UNDER SECTION 20-218 T. C. A. ET SEQ?

"2—DOES THE PROOF PREPONDERATE AGAINST THE JUDGMENT OF THE COURT?

"3—DID THE COURT ERR IN ALLOWING INTEREST ON THE COTTON VALUE FROM THE DATE THE SHIPMENT OF COTTON SHOULD HAVE ARRIVED AT ITS DESTINATION, IN EVENT QUESTION NO. 2 IS ANSWERED IN THE NEGATIVE?"

It is admitted by counsel for the plaintiffs that jurisdiction was obtained by service of process in accord with the provisions of T. C. A. sec. 20-218. That Section is as follows:

"When a corporation, business trust, or any person has an officer or agency, or resident director, in any county other than that in which the chief officer or principal resides, the service of process may be made on any agent or clerk employed therein in all actions brought in such county against same growing out of the business of, or connected with, said principal's business; but this section shall apply only to cases where the suit is brought in such counties in which such agency, resident director, or office is located."

■ It is an admitted fact that this Section applies to both domestic and foreign corporations. So many of our cases have so held that it is needless to style them here. Suffice it to say that many of them are annotated in the Code immediately following the above T. C. A. Volume 4, page 254, Section 20-218.

■ The demurrer admits the facts or statements made in the plea to be true for the purpose of the proper disposition thereof. What then are the facts disclosed by the plea? We find they are:

No. 1—Defendants execute contracts and maintain an office in Room 870 in the Shrine Building in Memphis, Shelby County, Tennessee.

2—In that office they have two employees, one referred to as a District Agent and on him, Mr. Benya, the service of the summons on the defendants was had. He has a clerk in that office, both of which are employed by the defendants, and live in Shelby County, Tennessee.

3—That Mr. Benya is a soliciting agent for defendants, and that his duties are performed as follows: He solicits freight and passengers for the defendants. He has authority to and has in that office issued what are termed "exchange bills of lading." That means that a shipment once in transit upon which a bill of lading has been issued by a proper issuing carrier, whether in this state or another state, and the shipper desires to change the designation of that shipment so as to direct its carriage by defendant, Mr. Benya has authority to and has at times issued the "exchange bill of lading".

4—He gathers information with respect to shipments of freight and passengers which might reach a destina-

tion or be carried over the lines of the defendant and communicates that information to them. It can be inferred from the statements in that regard that this information is gathered from shipments and passengers which originate in Tennessee as well as out of Tennessee.

5—All office supplies used in the office of defendants located in Memphis are furnished by the defendants, including the stationery, and writing or printing equipment. The office, in other words, is completely equipped with property of the defendants.

6—The defendants are carriers by rail lines in several states of the Union and with a system which is referred to as The Santa Fe System, which carries freight by and with equipment interchanged with all other rail carriers.

Counsel for plaintiffs, of course, rely first upon that Section of the Code, and also upon the following Court opinions:

"The Chicago & Alton Railroad Co. v. Walker, 77 Tenn. 475; Telephone Company v. Turner, 88 Tenn. 265, 266, 12 S. W. 544; Toppins v. E. T. & Ga. Railroad Co., 73 Tenn. 600; Alwood & Greene v. Hardwood Lumber Co., 152 Tenn. 544, 279 S. W. 795; Ketch v. Atlantic Coast Line R. Co., 51 F. Supp. 243 (E. D. Tenn. S. D. 1943); Texas Co. v. Cox, 178 Tenn. 239, 156 S. W. (2d) 809; Kansas City F. S. & M. R. Co. v. Daughtry, 138 U. S. 298, 11 S. Ct. 306, 34 L. Ed. 963, 965."

■ It is said in Smith v. Coach Company (1946), 183 Tenn. 676, 194 S. W. (2d) 867, in dealing with this section of the Code that:

"[This section] is a remedial one and should be liberally construed." In Texas Company v. Cox (1941), 178

Tenn. 239, 156 S. W. (2d) 809, in making the additional provision provided by this Section, the legislature prescribed another way of effecting service of process on corporations.

■ Under this Section the words "agency" and "office" are mere words of designation of a place or an individual in which the business of the company or non-resident is transacted by an agent. Johnson Freight Lines, Inc. v. Davis (1936), 170 Tenn. 177, 93 S. W. (2d) 637. It is not essential that the office or agency referred to in this statute be established in any particular county within this state with a view of maintaining the same permanently, and it is sufficient that at the time of service the corporation has such an office or agency in the county. Wrought Iron Range Co. v. DeVault (1927), 6 Tenn. App. 513.

Chicago & Alton Railroad Company v. Walker, 77 Tenn. 475, has partial application to the principle insisted upon by plaintiffs. In that case the process was served on Charles F. Ludlum, Southern passenger agent for the defendant.

"His business required him to travel over any portion of the States or territory mentioned, where he could find passengers or emigrants. Chattanooga was a good point, as several roads centered there, and he was often at that point, but was confined to no particular place."

The Court held the service under practically the same wording as our present Section of T. C. A. insufficient, however, saying:

"It could not have been intended to authorize suits here against non-resident firms or individuals by

service upon their traveling agents. It was only intended to allow such suits where such non-resident firms or individuals have an office or agency for the transaction of business located in some county in this State.''

In Telephone Company v. Turner, 88 Tenn. 265, 266, 12 S. W. 544, discussing the same Act and its limitations where suit was brought in a county where there was a local agent, said:

''The Code provisions covered every case where the foreign corporations had a local office and resident agent. It did not cover the case of a corporation having no resident agent, but doing business through and by means of traveling agents. [Chicago & Alton Railroad Co. v. Walker] 9 Lea, 475. This act enlarges the Code provisions, and is not a limitation.''

In Toppins v. E. T., Va. & Ga. Railroad Company, 73 Tenn. 600, in discussing the whole statute of similar import, said:

''* * * It is true these sections do not in terms profess to change Sec. 2811, in regard to the county in which actions may be brought, but relates to the person upon whom the process may be served. Still, the county in which the action may be brought depends upon the question as to who is the proper person upon whom the process is to be served. If the process is served on the principal officers, then the action must be brought in the county of the chief office; if the process may be served upon an officer or agent in another county, then the action may be brought in such other county, for it cannot be supposed that an action must be brought in the county

of the principal office, and yet process served in another county, and besides, the second section negatives any such idea; so that, in authorizing process to be served in certain cases upon officers or agents of the corporation in a county other than the county of its chief office, it must have been intended to authorize the action to be brought in such other county. * * *''

'' * * * The true construction of the statute is not that the action lies alone in such county, but that it lies in any county where the company has an office or agency.''

In Alwood & Green v. Hardwood Lumber Co., 152 Tenn. 544, 279 S. W. 795 relied upon by the plaintiffs, the service on an agent who had no positive office in the county was sustained on the theory that the agent on whom service was had was good because the agent was not only representing the defendant, but that he (P. 547, 279 S. W. p. 796):

''* * * represented the defendant in the transaction out of which this litigation grows, was not only an 'inspector' for the defendant with narrowly limited duties, as contended by the defendants, but was an agent to the extent and in the sense contemplated by our statutes.''

So it would seem that case is no authority for the position supported by the plaintiffs. It is not shown in the instant case that Benya had anything to do with the actual making of the contract out of which the transaction grew.

A case relied upon by plaintiffs and very similar, but not exactly so, is that of Ketch v. Atlantic Coast Line R.

Co. U. S. District Court, East Tennessee, No. 51 F. Supp. page 243. A motion to quash the summon because of the service on an agent, as relates to the present case was:

"That the said Morris is only a commercial agent and not such representative as contemplated by the statute upon whom service could be had."

The Court said on pp. 244-245 of 51 F. Supp:

"The relief sought is based upon the allegations of negligence occurring in the State of Georgia.

\*      \*      \*      \*      \*      \*

"\* \* \* The affidavits disclose that Mr. Morris maintained an office in Chattanooga, had secretarial aid, all of which were paid for by the defendant. That his duties were soliciting freight and passenger business for the defendant. That the defendant jointly with the Louisville and Nashville Railroad Company operated a railway in Tennessee known as the Clinchfield.

"The service of the process upon Morris, if good at all, is by authority of the Tennessee law codified at Section 8669 of the Tennessee Code.

\*      \*      \*      \*      \*      \*

"It seems clear that Mr. Morris was maintaining an agency for the defendant. Service on him will be good conditioned that it does not violate the commerce clause or the due process clause of the Constitution.

\*      \*      \*      \*      \*      \*

"Neither does it affect the service because the cause of action arose out of this State. Alwood &

Green v. Buffalo Hardwood Lumber Co., 152 Tenn. 544, 279 S. W. 795. See Annotations, 30 A. L. R. 258, 96 A. L. R. 368, 113 A. L. R. 134.''

The only difference in that case and the one here is the fact that the defendant, as stated above, in connection with L. & N. Railroad Company operated a railroad partially in Tennessee known as the Clinchfield. The plaintiff was a resident of the State of Maine and the defendant incorporated under the laws of the State of Georgia.

Texas Company v. Cox, supra at p. 242 of 178 Tenn. at p. 810 of 156 S. W. (2d) in dealing with Section 8669 which is one of the sections authorizing service on an agency of a foreign corporation, the Court said:

''Section 8669 certainly applies to foreign corporations maintaining an office in this State. Chicago & Alton Railroad Co. v. Walker, 77 Tenn. 475, 9 Lea 475; Peters v. Neely, 84 Tenn. 275, 16 Lea 275; Telephone Company v. Turner, 88 Tenn. 265, 12 S. W. 544, 545.

''While the exact question made in the case before us did not arise in the foregoing cases, nevertheless the opinions in those cases clearly indicated the view of the Court that a foreign corporation maintaining an office in this State, with no representative here except the local agent at that office, was amenable to process served on such local agent.''

The Court then refers to Telephone Company v. Turner, supra, and quotes that part of the opinion hereinbefore quoted.

The Court also made reference to all of the sections of the Code with respect to service on a corporate entity,

domesticated and foreign, and said they must be construed together. There was a concurring opinion by Justice Chambliss and a dissenting opinion by Justice De-Haven.

In Kansas City F. S. & M. R. Co. v. Daughtry, supra, the exact question now before us was not involved, except inferentially, but the meaning of all of the involved sections were discussed. Eminent lawyers from the City of Memphis in that day represented the parties in that case and just before the conclusion, which was to the effect that the petition for removal of the case from the State Court to the Federal Court, did not question the sufficiency of the service of process, the petition was dismissed and the judgment attacked by the petition, alleged to be void, was affirmed. However, the Court said:

"At common law, service was made on such head officer of a corporation as secured knowledge of the process to the corporation, and the provisions of this statute seem constructed ex industria to increase the number of officers or agents, service upon either of whom would be sufficient. In view of the State legislation and decisions, service upon the highest officer of the corporation to be found in the county, and that officer the superintendent there, was within the spirit of the rule and the intent and meaning of the statute."

The last case decided by Supreme Court of the State of Tennessee, insofar as we are advised, is that of Tucker v. International Salt Company, 209 Tenn. 95, 349 S. W. (2d) 541 by the late Justice Swepston. In that case he discusses the meaning and application to the facts as stated there of our T. C. A. sec. 20-217 and T. C. A. sec.

20-220, which relate to service on foreign corporations as well as domestic corporations as it is related to T. C. A. sec. 20-217.

In this case International Salt Company is a non-resident corporation domiciled in the State of Pennsylvania and is a New Jersey corporation. It had a representative in Shelby County Tennessee, Lloyd T. Williams, Jr. He was not an officer or other head of the Salt Company nor was he a director in that company, but he had a written contract with the Company to sell its product, and was receiving a salary of $526.00 per month plus a bonus if the sales exceeded a minimum quota. It is said:

"* * * he carries and distributes a card upon which there is inscribed in large black letters International Salt Company Clarks Summit, Pennsylvania, and in smaller letters Lloyd T. Williams, Jr., Special Merchandising Representative; he uses and distributes literature supplied by the Salt Company to aid him in his sales of its products, which literature he keeps in the automobile furnished to him by the Salt Company, which automobile is owned by the Salt Company, registered in Shelby County, Tennessee, and Williams is given an expense allowance for the operation and upkeep of said automobile; Williams signs order blanks when he receives orders from a customer but no contracts between the Salt Company and wholesale or retail dealers in the State of Tennessee are made but said orders, which are sent to the Salt Company office by either Williams or the customer, are expressly designated as 'offers', which must be accepted by the International Salt Company

upon receipt of it in Pennsylvania before becoming binding; payments by customers for products delivered to them are made directly to the Salt Company in Pennsylvania; Williams carries samples of his Company's products, he is allowed to handle only the Salt Company's products; he makes a weekly report; he has called on two or three past due accounts, and in one case was given a check in payment of a past due account payable to the Salt Company which he forwarded directly to the company * * *.''

The opinion then recites the fact that his superior official has offices in New Orleans, Louisiana, and Williams is simply recognized and classified as a soliciting agent of that defendant company with no specific office or domicile in Tennessee, insofar as he is concerned, and he travels through different sections of other states, and is purely a solicitor for business, and makes no binding contracts.

The case was tried in the lower Court on a stipulation of facts, and the trial Judge dismissed the complaint filed by Paul Tucker who had sued the corporate defendant for breach of contract and on a quantum meruit basis for damages and had service of process on Williams. In the stipulation there is a statement:

''* * * Williams spends about four days a month on the average soliciting orders in Tennessee * * * Salt Company during the year 1960 made approximately $10,000 from sales made to wholesale grocery houses in the Western District of Tennessee alone * * *''

In that case the opinion gives consideration to International Shoe Company v. State of Washington, 326 U. S. 310, 66 S. Ct. 154, 90 L. Ed. 95 and McGee v. Inter-

national Life Ins. Co., 355 U. S. 220, 79 S. Ct. 199, 2 L. Ed (2d) 223, and some other cases, but as to the two above referred to cases the Court said:

"* * * The theory of the first two of those cases, which hold the service of process may be had on the foreign corporation, is that where the facts show that the activities of the corporation reveal a 'substantial connection' with the state, valid service may be made. This is also the theory in behalf of Tucker in this case."

In that case the Court also said:

"To be sure the United States Supreme Court has come a long way from the original personal service requirement of Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565. There are numerous cases since then showing a liberalization or broadening of the rule under various circumstances to permit or require service on foreign corporations where it has manifested its 'presence' in the forum state."

Referring to Abel v. Albinia Engine & Machine Works, 10 Cir., 1960, 284 F (2d) 510, 512. Then he said:

"Very little besides mere solicitation of interstate orders has been considered sufficient to sustain service of process in these interstate sales transactions. Scholnik v. National Airlines, Inc., 6 Cir., 1955, 219 F. (2d) 115."

The opinion then refers to the fact it was insisted that the record clearly showed that the transaction "relates to a transaction had, in whole or in part, within this State." On that point the Court said:

"This insistence must be overruled for the reason that the stipulation controls and it fails to show that there was a contract for personal services in aid of one of the Company's Shelby County salt brokers. Therefore, we cannot determine whether or not this alleged contract relates to any transaction had in whole or in part within this State."

The distinct difference between that case and the case now being considered is the fact that in the instant case there was a fixed office, 870 Shrine Building, there was a secretary that kept that office and there was this particular agent who had authority to execute and did execute on occasions, as shown by this proof, contracts binding the company that he represented to receive and carry freight and passengers which might originate in other states, but which, as we understand it, might also not only have its destination in other states, but that the exchange bill of lading might be issued while freight was in transit in another state for the property to be delivered in this state, the shipper having directed a change in its transportation to some other point or some other consignee.

As stated in that case, the writer of the opinion called attention to the fact there had been a recent decision in a case styled "Eli Lilly and Company v. Sav-On-Drugs, Inc., et al (1961) 366 U. S. 276, 81 S. Ct. 1316, 6 L. Ed. (2d) 288". The report of that case is in Advance Sheets No. 3 of said Volume 6, page 288, the opinion being delivered by Justice Black.

It seems to us that the case of Tucker v. International Salt Company, supra, was decided in accord with the old

"drummer" cases which were so often before our Federal courts in the past.

The International Shoe Company case v. Washington, supra, had a different question, as we understand, from the case of Tucker v. International Salt Company. Chief Justice Stone who wrote the opinion for the Supreme Court in the Shoe Company case said:

"The questions for decision are (1) whether, within the limitations of the due process clause of the Fourteenth Amendment, appellant, a Delaware corporation, has by its activities in the State of Washington rendered itself amenable to proceedings in the courts of that state to recover unpaid contributions to the state unemployment compensation fund exacted by state statutes, Washington Unemployment Compensation Act, Washington Revised Statutes, sec. 9998—103a through sec. 9998—123, 1941 Supp., and (2) whether the state can exact those contributions consistently with the due process clause of the Fourteenth Amendment."

McGee v. International Life Ins. Co. in the opinion written by Justice Black for the Supreme Court, and making reference to the case referred to in the opinion by Justice Swepston of Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565, Justice Black in the Supreme Court said:

"* * * In a continuing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations. See Henderson, The Position of Foreign Corporations in American Constitutional Law,

c. V. More recently in International Shoe Co. v. Washington, 326 U. S. 310, 66 S.Ct. 154, 90 L. Ed. 95, [161 A. L. R. 1057], the Court decided that 'due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contracts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'.''

And then he further said:

''Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.''

Now Mrs. McGee had brought suit and obtained judgment in California on a life insurance policy on her deceased husband. She could not enforce that judgment because the insurance company had not qualified in that State and had no property in the State, and came to the State of Texas and brought suit to enforce that judgment, and so the question was the validity of the judgment of

the State of California. In holding that the due process clause did not apply to prevent the enforcement of that California judgment in the State of Texas, he said:

"Turning to this case we think it apparent that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent. * * *"

True it is that the case is not one involving railroad transportation, but the opinion indicates it was the only insurance contract the company had in California, however, with the modern day rail traffic involved, can it be said there is any good reason why that the railroad corporate entity should stand upon any higher ground than any other corporate entity within a state that authorizes service upon an officer or agent of that foreign corporation found within the State and doing business in connection with the company business?

The defendants in the instant case plant themselves upon the case of Green v. Chicago, B. & Q. R. Co., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916, decided by the Court April 29, 1907. The case was filed to begin with in the United States District Court, and service did not depend upon the provisions of the state statute relative to foreign corporations. The counsel for plaintiffs in the instant case say:

"* * * The action was not brought or prosecuted in a state court, nor did it involve the interpretation or application of a state statute. * * *"

In the opinion it is said:

"The jurisdiction of the circuit court in this case was founded solely upon the fact that the parties

were citizens of different states. In such a case the suit may be brought in the district of the residence of either. (citing several cases which go back to 1875 and shown to be as late as 1901). But to obtain jurisdiction there must be service, and the service was upon the corporation in the eastern district of Pennsylvania. Its validity depends upon whether the corporation was doing business in that district in such a manner and to such an extent as to warrant the inference that, through its agents, it was present there. * * *''

It is further said:

''The question here is whether service upon the agent was sufficient; and one element of its sufficiency is whether the facts show that the defendant corporation was doing business within the district. It is obvious that the defendant was doing there a considerable business of a certain kind, although there was no carriage of freight or passengers.''

In that case the defendant railroad company had no rail lines in the Court forum, that is, in the district of the Court, and it did not carry passengers or freight within the district. It did have, however, as shown by the opinion, soliciting agents in that district, one of them by the name of Heller. It is said by the opinion:

''* * * Mr. Heller, hired an office for him in Philadelphia, designated him as district freight and passenger agent, and in many ways advertised to the public these facts. The business of the agent was to solicit and procure passengers and freight to be transported over the defendant's line. For conducting this business several clerks and various traveling

passenger and freight agents were employed, who reported to the agent and acted under his direction. He sold no tickets and received no payments for transportation of freight. When a prospective passenger desired a ticket, and applied to the agent for one, the agent took the applicant's money and procured from one of the railroads running west from Philadelphia a ticket for Chicago and a prepaid order, which gave to the applicant upon his arrival at Chicago, the right to receive from the Chicago, Burlington & Quincy Railroad a ticket over that road. Occasionally he sold to railroad employees, who already had tickets over intermediate lines, orders for reduced rates over the defendant's lines. In some cases, for the convenience of shippers who had received bills of lading from the initial line for goods routed over the defendant's lines, he gave in exchange therefor bills of lading over the defendant's line. In these bills of lading it was recited that they should not be in force until the freight had been actually received by the defendant.''

Now if the fact that the case was filed in the Federal Court, and the rule governing doing business within the district is the same as that required by our state statute, and if the opinion in that case has not been so modified by later cases, as to render its application to the present case inapplicable, certainly it would be a controlling basic opinion of the United States Court, and which fact therein is practically similar to the facts in the case in which this opinion is being written. There is a slight difference, and attention will be called to that difference as this opinion proceeds.

Learned counsel for defendants say:

"The authority of Green v. Chicago, Burlington & Quincy Railway Company, supra, in the area of railroad solicitation offices has not been diminished by the case of International Shoe Company v. Washington, (hereinbefore referred to) nor McGee v. International Life Insurance Co., 355 U. S. 220 [78 S. Ct. 199, 2 L. Ed. (2d) 223]."

They insist that none of the cases which have more modern application to state statutes with respect to service of process and the doing of business within a sovereign state, have in any wise affected the holding in the Green case. They also insist that the railroad business composed of a quasi-public corporation deserve unique considerations that do not have to be considered in cases of other types involving foreign corporation business in the states. And they say that litigation of the type here involved,—and that this litigation itself, under the facts of this case constitutes an unreasonable burden on interstate commerce contrary to Article I, Section 8 to the Constitution of the United States. Supporting their contention they rely upon Davis v. Farmer's Cooperative Equity Co., 262 U. S. 312, 43 S. Ct. 556, 67 L. Ed. 996; Denver and Rio Grande Western R. R. Company v. Terte, 284 U. S. p. 284, 52 S. Ct. 152, 76 L. Ed. 295; Michigan Central R. R. Co. v. Mix, 278 U. S. 492, 49 S. Ct. 207, 73 L. Ed. 470. In this connection they say that the plaintiffs' action violates the due process clause in attempting to maintain this suit in Tennessee because they do not meet any of the five tests required to be met to satisfy the requirements of due process which are set out specifically in Napelbaum v. Atlantic Greyhound Corporation, 171 F. Supp. 547 (D. C. S. D. N. Y.) (1958). In that case it is said:

"The Federal limitation, as formulated by the Supreme Court, permits in personam jurisdiction to be obtained over a foreign corporation provided that it has certain minimum contacts with the State of the forum, so that the maintenance of the suit there will not offend traditional notions of fair play and substantial justice. McGee v. International Life Insurance Co., 355 U. S. 220, 222, 78 S. Ct. 199, 2 L. Ed. (2d) 223; International Shoe Co. v. Washington, 326 U. S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95. This due process test requires that all pertinent factors be considered, such as the nature and character of the business. (MacInnes v. Fontainebleau Hotel Corp., 2 Cir., 257 F. (2d) 832), the number and type of activities within the forum (Green v. Chicago, Burlington & Quincy Railroad Company, 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916), whether such activities give rise to the cause of action (International Shoe Co. v. Washington, supra, 326 U. S. at page 317, 66 S. Ct. at page 158; French v. Gibbs Corporation, 2 Cir., 1951, 189 F. (2d) 787, 790), whether the forum has some special interest in granting relief (McGee v. International Life Insurance Co., supra), and the relative conveniences of the parties (International Shoe Co. v. Washington, supra, 326 U. S. at page 317, 66 S. Ct. at page 158).

"The Supreme Court cases cited make it clear that where the cause of action arises out of the activities conducted within the forum no systematic and continuous course of conduct of a substantial nature is required. *In the McGee case the making of a single contract was sufficient. However, for a foreign corporation to be held subject to suit within the forum*

*for all purposes, including suits not arising out of its local activities, slight and occasional contacts are not sufficient; the corporate operations within the state must be both continuous and substantial.* International Shoe Co. v. Washington, supra, 326 U. S. at page 318, 66 S. Ct. at page 159.'' (Emphasis added)

█ We do not understand the five tests as set out in Napelbaum v. Atlantic Greyhound Corporation, supra, are the only factors to be considered in determining whether or not a foreign corporation has so activated itself in a state that renders it subject to jurisdiction of the state court. The five tests set out therein are:

''1—Nature and character of the business,

''2—Number and type of activities within the forum,

''3—Whether such activities give rise to the cause of action,

''4—Whether the forum has some special interest in granting relief, and,

''5—Relative convenience of the party.''

We have set out herein on pages 8 and 9 the things that we understand the pleas to admit with respect to the business of the defendants as carried on by the agents at the office in Tennessee. If we limit these ''pertinent factors'' to the five herein stated above, and apply these to the activities as hereinabove designated, and none others, we still can hardly see how the defendant can escape submitting to the jurisdiction of the Courts of the State of Tennessee.

We think, however, there are other considerations that must enter into the whole picture. Such as the location of the city in which the offices are maintained and the area in which the agents therein operate. We also think that we must remember the nearest termini of the defendants, if a railroad or other type of public carrier, to the point where these offices are maintained. If we are right about that then we must recognize that the City of Memphis is located almost in the corner of four states. The larger part of Memphis is located in Tennessee. It is located where there is a large terminal of commerce by water with a large amount of freight that is carried by water to and from Memphis and transferred onto rails or water that start from and arrive at that point, to and from all sections of the country. Likewise it is a railroad center for a great area of the United States and that these rail lines coming into the City of Memphis from the East and from the South and North, particularly that section of the United States East of the Mississippi river have termini with the rail carriers that cross the river and go west toward the termini of these defendants. So that it makes it a great convenience and is good business judgment for these defendants to maintain, in the city of Memphis, County of Shelby and State of Tennessee, where all of these facilities are available, the office that is admitted it maintains and the work that it authorizes to be done in that office.

So far as we are able to understand this office does almost any type of business that could be done by a railroad company in any part of the State of Tennessee or any other state in the Union where the company had no tracks nor termini of its own. Thus the activities which are set out in the pleas, and by the demurrer are admitted,

are such as are continually "growing out of the business of, or connected with, said principal's business" as set forth in T. C. A. sec. 20-218.

■ What burden has the fact that an individual has brought suit in the Courts of Tennessee in Shelby County, where this office is located, on interstate commerce or how does it violate the due process clause of the Constitution of the United States of America, Amend. 14? We are unable to find any such burden or violation of due process. We must remember we are not here dealing with the question of the State of Tennessee undertaking to exact from these defendants a tax or require it to make payment of social security on the salaries that are paid to its employees in Tennessee. We are simply dealing with the question of whether or not a citizen of these United States may come into this State of Tennessee and in Shelby County, where this office is maintained, and have defendants subjected to the jurisdiction of the Court of Tennessee. We have studied with some degree of care, at least, each case that was submitted to us for our consideration in support of the position that these defendants take in regard to the demurrer as their activities relate to doing business in this State, as well as the authorities that have been submitted to us by the plaintiffs, and we are in harmony with the action of the Trial Court in sustaining the demurrer to the pleas in abatement. Thus we answer our question "No. 1" set out on page 7 of this opinion in the affirmative.

The question of the issues upon the value of the cotton is much more easily decided and determined than was the question on the plea in abatement.

The Trial Court, in his opinion shown on page 918 of the record stated the matter this way:

"* * * as I stated earlier, the primary question that we have in this matter is whether to accept compress samples made in El Paso or the samples made at the Moody Pickery in Galveston, Texas."

Counsel for defendants insist that the samples taken after the fire at what is called the "Galveston Pickery" are truly representative of the character of the cotton at the time it was delivered to the carrier prior to the fire damage. They also insist that the "Gin samples" truly represent the character of the cotton at the time it was delivered to the carrier before the fire damage. On the other hand counsel for plaintiffs insist that the character of the cotton is best shown by the samples that were taken and which are referred to as "compress samples" represent the character of the cotton before it was shipped and before the fire damage.

It is shown by this record that when cotton reaches the compress a sample is taken from each side of the bale. The bale is numbered and an identifying number of the bale and the samples are the same. The number that follows the sample is placed between the two samples from each bale and that identification number follows both the samples and the bale wherever it may be shipped. The compress samples are sent first to the purchasers of the cotton for their classifications and identification and for submission of grades and character of cotton for prospective buyers. That was done in this case. Compress samples of the cotton in question were made in El Paso, Texas, and at the Farmers Cotton Compress and were sent to the plaintiffs, the cotton merchant, in this case.

Mr. Ortiz, the plaintiff, is an experienced and qualified cotton classer or grader, depending upon the term used in the trade. He examined and classified these compress samples. He testified extensively in this record.

Hughes Butterworth, the manager of the classing department of the Southwestern Irrigated Cotton Association in El Paso, Texas, examined the compress samples and testified as to the quality thereof. After he had given his experience and his qualifications, further stated that these compress samples were more nearly representative of the quality of the cotton than samples taken particularly after a fire had damaged the cotton, and he was particularly careful in making his statement with respect to how cotton could be damaged from a fire while loaded into a box car.

W. K. Palmer, a witness for the defendant, also a qualified cotton classer, testified that samples taken from cotton bales after there had been a fire which ignited a part of the cotton bale in a car, were not representative of the class of the cotton before it had any fire damage. He classified the cotton in question from the pickery samples and he said that classification which he submitted was not representative of the quality of the cotton before it was involved in the fire.

Not only do we have in the record the classification of the involved cotton based upon the warehouse or compress samples, and the classification based upon the pickery samples, but we also have a classification based upon what is called "the gin samples".

It is contended by the defendant that when you take the quality of the cotton as evidenced by the gin samples it is best representation of the original quality, and if you

take the pickery samples, which evidenced the quality of the cotton after fire, that these two relative classifications preponderate in favor of the correct classification of the cotton before the fire as against the classification from the compress or warehouse samples.

The gin samples were introduced in the record by the defendants. The person who examined those samples, that is, who took the samples and made the classification, is not identified but they were made by someone in the government classing office in El Paso sometime between October 21, 1958, and January 28, 1959. The result of that classification is set out on Exhibit 3 marked for identification to Henry Maxheim, which exhibit is identified by the witness Frazier.

The record shows it is against the policy of the government for the name of the individual who did the classifying of the ginners' samples for the government classing office, to be revealed, therefore, the person who did that classification did not testify in this case.

Counsel for defendants in their pleas have said with respect to these gin samples, that the Court disregarded them because of some speculation about the experience and qualification of the person doing the classing. In their brief at page 49, after commenting on the fact that witnesses had testified that the government classifiers were generally competent as classifiers, it is argued:

"Yet the opinion of the Trial Court shows clearly that on the very issue of the condition of the cotton when it was ginned and before it had ever been in the possession of the defendants, and being the issue we regard as the most crucial and important in the entire lawsuit, he abandoned the proof which was in the

case and which admitted and established the competency of the Government Classing Office at El Paso, and turned instead to speculation about the experience and qualifications of the person or persons who classed the original gin samples."

Learned counsel for defendants say that the Court abandoned the proof which admittedly established the competency of government classing office at El Paso, and say that the plaintiff, Arthur Ortiz, Sr. and Mr. William J. Britton and Mr. Robert E. Boeving having agreed that the government classing offices are competent that it was not necessarily thought by them that the experience and qualifications of every cotton classer employed by the Government was pertinent.

We hardly think the Court abandoned any reasoning of any of the testimony in this case. We think he was merely explaining that there were certain features in connection with this evidence that he had to consider in properly weighing it along side other evidence. He referred to the fact that no one knew who took the samples from the cotton at the gin nor how it was handled before it reached the classifiers' office. He explained that there was no cross examination of the parties who drew the samples or who made the classification referred to as "gin classifications". The Court in his explanation, has stated that there is some question of fact raised by defendants' counsel that the witnesses who examined the compress samples and classified the involved cotton from same, had samples from the wrong cotton, but he further said:

"* * * There is no one questioning the fact that there was a bona fide explanation as to what happened to the warehouse samples."

He then said:

"Now, we get down to the U. S. D. A. classification made at El Paso, which was called a gin classification. The classification was made from samples taken at the gin. We do not know who made that classification. We do not know who took the samples or who made the classification on those samples. All we have is the deposition of the head of that office."

He then explained the fact there being no opportunity for cross examination of the witnesses in that regard, this "affected what was done at the El Paso gin in regard to classification of the gin samples." We think he meant it was bound to affect the weight that he would give that kind of testimony as against testimony of witnesses who had been scrupulously cross examined, such as plaintiff Ortiz, Mr. Butterworth and Mr. Britton, whose evidence the Court accepted as most correct.

We have stated in the opinion that there seems to be an admission on the part of defendants that the fire having originated in transit and damaged this cotton, they are liable for some amount, in event the Court has properly taken jurisdiction of the case.

The defendants accepted this cotton in ATSF car No. AT149699 consisting of 97 bales at Las Cruces, New Mexico, for transportation to Houston, Texas. Three days later while this cotton was in that car at Brownwood, Texas, the yardmaster discovered smoke coming

from the car door at about 5:25 P.M. On his instructions the car was placed on what is termed "old rip track" holes punched in the top of the car and the steam hose placed inserted, with steam on the car of cotton from 6 P.M. until 8 A.M. The fire was extinguished. It was discovered there that 21 bales had been badly burned. The Yardmaster reported that these 21 bales were rolled out on the ground, scattered around in the area reasonably close to the track, and that while the 76 bales were not damaged by fire, they were damaged by smoke and water.

The cotton remained in Brownwood until on June 11th or 12th when all 97 bales were loaded into three box cars and carried to Galveston to the W. L. Moody reginning plant for reconditioning. 76 bales were exposed to the elements and were on a platform adjacent to gravel area used by Santa Fe trucks to deliver freight from their freight house. On arrival at the reginning plant at Galveston 32 bales of that cotton was found so badly burned that they were not merchantable, and that all of the loose and burned cotton was picked from them and the bales were so small they could not be used. The salvaged cotton from these bales was "married in with other pieces of bales". After all the salvaging was done that could be done, there was approximately 87 bales of the damaged cotton.

The salvaging process of the cotton at the pickery shows that there were 16 bales of burnt picking, 10 bales of scorched picking, 5 bales of loose cotton and 65 bales, much of which had been reconditioned. The total weight loss is shown to be 15,827 pounds or approximately 32%. The record indicates that is a rather high fire loss for that kind of baled cotton.

· The record shows that cotton when it is carried through the heating process is short,—that is it snapped, the fibre having lost its oil; that the cotton becomes spotted and discolored, and that the better the grade of cotton the more susceptible it is to such damages in the bale.

It is reasonably argued that there might have been two fires of this group of cotton rather than one. The one having occurred before it reached Brownwood or while it was on the Brownwood yard where the Yardmaster said 21 bales of the cotton was burned or scorched and the other 76 were water soaked and smoked. But on arrival of that same quantity of cotton in Galveston 15 or 16 days later, examination showed 32 bales of cotton badly burned that was unmerchantable and that it was unbaled and the pickery process begun. There is no proof, however, in the record that any other fire was ever discovered after the cotton left Brownwood, so it would seem that the Yardmaster in Brownwood might have not observed some of the cotton that was found burned, at that time.

The Court found from the evidence introduced that the classification known as the ''Hughes Butterworth classification'' of the quality and grade of the cotton at the time it was loaded on to the cars of the defendants was proper. Mr. Butterworth, as hereinbefore stated, is corroborated by other evidence. He was the manager of the classifying department of the Southwestern Irrigated Cotton Growers Association, El Paso, Texas, and together with the plaintiff, appears to be fully familiar with the cotton from the area of the cotton growing section involved. If we are not to support the Court in adopting that classification, we are forced to say the evi-

dence, in connection with the classification of the involved cotton, preponderates against what is known as the "Butterworth classification", and therefore against the judgment of the Court. That classification is shown in different places in this record. It was made from the compress samples taken from the cotton before it was ever delivered to the defendants for transportation.

Giving consideration to every factor that enters into the classification of this cotton, and to all of the proof with respect to the classification of the cotton based upon the samples known as gin samples, the samples known as the pickery samples, and the samples known as the compress samples, we are unable to say that the proof in this case preponderates against the Trial Judge's determination with respect to the samples that are most representative of the classification of the cotton. T. C. A. sec. 27-303.

This brings us now to the question of the value of the cotton based upon the Butterworth classification. The value based upon that classification was fixed by Mr. Hoover, Mr. Rabb and The Roundtree Cotton Company, referred to in the record as "Roundtree" and these values based upon that classification has fixed the value thereof, on the date it was to have been delivered in Houston, Texas, at, — according to Hoover 30.50 per pound, according to Rabb 30.55 per pound, and according to Roundtree at 30.50, and the Court adopted this value for the 88 bales of the cotton known as the 1517 El Paso cotton.

The proof is also as clear with respect to the value of the Pima cotton, which is the long-staple cotton involved, and in arriving at the value based upon these

classifications the figure as shown by the judgment of the Court is $16,295.85, less a small loss in weight as shown by the testimony of Ortiz and exhibits thereto, which amounts to $91.50 based upon the values hereinbefore referred to, or $16,204.35. We can find no preponderance in the evidence against the action of the Court in that regard.

■ Now then this brings us to the question of whether or not the Court is correct in allowing interest upon the amount of the judgment from the date the cotton should have been delivered, or would have been delivered, June 2, 1959, at the point to which it was consigned in Houston, Texas, had there been no fire.

With the facts in this record appearing as they do, we are of the opinion that the Court did not abuse his discretion in the allowance of this interest. Therefore, we are compelled to answer our Questions Nos. 2 and 3 as shown by page 7 of this opinion in the negative.

As stated hereinbefore this is a very large record. The briefs and arguments are long and the reference to supporting cases are many. Some of which we have not mentioned, but we have studied carefully those cases which we consider to govern our conclusions.

The preparation for and the trial of this case together with the care, patience and consideration by the Trial Court, the briefs, arguments and presentation of this case on appeal have been as thorough, if not more so, than any record examined by the writer of this opinion since he has been in this Court, and as heretofore stated, the legal question involved has given us considerable trouble. However, we think the Trial Court reached the right conclusion. His judgment is affirmed and the cost

of the case is adjudged against the defendants and the sureties on the appeal bond. Judgment will be entered in accord with this opinion.

Carney, J., concurs.

Bejach, J. (dissenting).

I respectfully dissent from the majority opinion in this case.

In Chicago & Alton Railroad Co. v. Walker, 77 Tenn. 475, the Supreme Court held that a traveling commercial agent of the Chicago & Alton Railroad Co. was not such an agent as to authorize service of process on him, where the Railroad Company was not doing business in Tennessee, even though the litigation there involved grew out of a contract made with that particular agent. Process had been served in that case under authority of the statute now carried forward into section 20-218 T. C. A., which is the one relied on by plaintiffs in the instant case. To meet the defect involved in the Walker case, as was held in Telephone Co. v. Turner, 88 Tenn. 265, 266, 268, 12 S. W. 544, chapter 226 Acts of 1887, was enacted,—which statute is now carried forward into section 20-220 T. C. A., but that statute applies only where the transaction involved, or at least a part of same occurs in Tennessee, or with the agent on whom process is served. In the instant case, certainly none of the transactions involved were conducted in any manner, directly or indirectly, with the commercial agent on whom process was served, nor were they in any other manner connected with Tennessee. In order to bring the case within the provisions of section 20-218 T. C. A., and distinguish it from the facts involved in the case of Chicago & Alton Railroad Co. v. Walker, reliance is placed alone on the

circumstance that, in the instant case, the agent served had a permanent office; whereas the agent served in the Walker case was merely a traveling agent. In spite of maintaining a permanent office, however, the agent served in the instant case was merely a commercial agent, whose duties and authority were substantially identical with those of the agent served in the Walker case. In my opinion, the fatal defect in the instant case is that the defendant railroad companies have neither qualified to do business in Tennessee, nor are they doing any part of their business in Tennessee. Solicitation, in Tennessee, of business to be done in other States is not doing business in Tennessee. This principle has been reiterated by our Supreme Court in the recent case of Tucker v. International Salt Co., 209 Tenn. 95, 349 S. W. (2d) 541. In that case, as in the case of Chicago & Alton R. R. Co. v. Walker, the agent involved was a traveling agent. To the same effect, see, also, the even more recent decision of this court, Eastern Section, in Fisher v. Trion, Inc., 49 Tenn. App. 182, 353 S. W. (2d) 406, in which case certiorari was denied by the Supreme Court December 8, 1961.

In my opinion, in order to authorize service of process on a foreign corporation, under section 20-218 T. C. A., the test should be, not whether the agent in question maintains a permanent office in Tennessee, but, whether the company for whom he maintains such office is doing business in Tennessee. My conclusion is in accord with the ruling of the Tennessee Supreme Court in Johnson Freight Lines, Inc. v. Davis, 170 Tenn. 177, 182, 93 S. W. (2d) 637, 638. In that case, the Supreme Court in an opinion written by Mr. Justice DeHaven, defined the

term "officer or agency" as used in section 20-218 T. C. A., as follows:

"Defendant [has] no 'office or agency' in Hamilton County within the meaning of Code, sec. 8669 (now sec. 20-218 T. C. A.). It is only when a corporation, business trust, or any person has an office or agency, or resident director, in any county other than that in which the chief officer or principal resides, that service of process 'may be made on any agent or clerk employed therein.' Except in the case of a resident director of a corporation, it is apparent that in order to have valid service of process on an agent or clerk there must exist in such county 'an office or agency' in which said agent or clerk is employed. The word 'agency,' just as the word 'office,' is employed in the sense that it designates a place *at which the business of the company, or individual, is transacted by an agent.*" (Emphasis added.) Johnson Freight Lines, Inc. v. Davis, 170 Tenn. 181-182.

The limitation on the terms "office or agency" as set out in the above quoted language of the Supreme Court of Tennessee is in harmony with the language of the Supreme Court of the United States in the case of Green v. Chicago, B. & Q. R. Co., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916, in which case the following language was used:

"But to obtain jurisdiction there must be service, and the service was upon the corporation in the eastern district of Pennsylvania. Its validity depends upon whether the corporation was doing business in

that district in such a manner and to such an extent as to warrant the inference that, *through its agents, it was present there."* Emphasis added.)

In my opinion, neither the Atchison, Topeka & Santa Fe Railway Co., nor the Gulf, Colorado & Santa Fe Railway Co. were, through the commercial agent, Michael M. Benya, on whom process was served in the instant case, present in Shelby County, Tennessee, when he was served with process. It is, therefore, my opinion that the plea in abatement filed in this cause should have been sustained, and the present suit dismissed. For that reason, I dissent from the majority opinion which holds otherwise in this cause.