VAN LIEROP *v.* CHESAPEAKE & OHIO RAILWAY
COMPANY.

1. COMMERCE—INTERSTATE COMMERCE—COMMODITIES.
The transportation of a commodity from one State to another
by railroad is interstate commerce and is governed by pro-
visions of the interstate commerce act (49 USCA, § 1 *et seq.*).

2. CARRIERS—THROUGH BILL OF LADING—RECEIPT—CONTRACTS.
A through bill of lading, issued by one carrier to a destina-
tion on the line of another carrier, is both a receipt and con-
tract of carriage and delivery.

3. SAME—PERISHABLE COMMODITIES—PROTECTIVE SERVICE—HEATER
TERRITORY—INSTRUCTIONS.
Carriers' protective service as to perishable commodities, ne-
cessitated within heater territory on shipments originating
between November 16th and March 1st, is designed to pro-
tect the commodity against frost, freezing or artificial over-
heating and, since the carrier may be given no instructions
as to the manner of handling, the carrier sets the standard
of care necessary for the shipment (49 USCA, § 1 *et seq.*).

REFERENCES FOR POINTS IN HEADNOTES
[1] 11 Am Jur, Commerce §§ 4, 7, 63.
[2] 9 Am Jur, Carriers §§ 387, 388, 412.
[3, 6, 7, 9] 9 Am Jur, Carriers §§ 337–339, 481.
[4] 9 Am Jur, Carriers §§ 834, 841.
[4] Presumption and burden of proof as to consignee's title to or
interest in respect of goods comprising shipment, in consignee's
action against carrier for loss, damage, delay, nondelivery or
conversion. 135 ALR 456.
[4, 11, 12] Presumption and burden of proof regarding mitigation of
damages. 134 ALR 277.
[4, 5] Presumption and burden of proof as to carrier's responsibility
for goods received in good condition and delivered to consignee
in bad condition. 53 ALR 996; 106 ALR 1156.
[5, 6] 9 Am Jur, Carriers § 835.
[6, 13] 9 Am Jur, Carriers §§ 847–852, 855.
[8] 3 Am Jur, Appeal and Error §§ 854, 1151.
[10] 39 Am Jur, New Trial §§ 201, 202.
[11, 12] 9 Am Jur, Carriers § 792.
[14] 9 Am Jur, Carriers § 781.
[15] 9 Am Jur, Carriers § 780.

4. SAME—NEGLIGENCE—BURDEN OF PROOF.

Generally, a plaintiff in an action against a common carrier for damages for injury to goods while in transportation due to alleged specific acts of negligence has the burden of proof of showing the negligent acts and that such acts caused the damage alleged.

5. SAME—NEGLIGENCE—PRESUMPTIONS.

A presumption that damage to a commodity during transportation by a common carrier under a through bill of lading was caused by negligence of carrier is raised upon a showing by plaintiff that the goods were delivered to the initial carrier in good condition and received at its destination in a damaged condition (49 USCA, § 1 *et seq.*).

6. SAME—GLADIOLUS BULBS—NEGLIGENCE—EVIDENCE.

Motion for directed verdict, made by defendant delivering carrier under a through bill of lading, was properly denied, where plaintiff's evidence showed gladiolus bulbs were in good and proper condition when shipped, were loaded in customary containers and in a manner to provide air channels between the containers, a customary practice in such shipments in refrigerator cars, that containers bore labels showing shipper's name, variety, grade, size and number of bulbs and that same arrived at destination not fit for sale or planting due to overheating, excessive moisture, and insufficient ventilation (49 USCA, § 1 *et seq.*).

7. SAME—GLADIOLUS BULBS—PERISHABLE COMMODITY—PROTECTIVE SERVICE.

Instruction given by trial court that carrier must provide ventilation or such other protective service in the shipment of gladiolus bulbs, a perishable commodity, incident to its carriers' protective service against frost, freezing or artificial overheating was not error, where shipment originated in heater territory at a time when such protective service was required, and carrier had duty to handle the shipment in a reasonably prudent manner (49 USCA, § 1 *et seq.*).

8. APPEAL AND ERROR—QUESTIONS REVIEWABLE—VERDICTS—GREAT WEIGHT OF EVIDENCE—NEW TRIAL.

Whether or not verdict was contrary to the great weight of the evidence was properly before the Supreme Court for review, where raised by defendant in its motion for new trial.

9. CARRIERS — PROXIMATE CAUSE — EVIDENCE — GLADIOLUS BULBS — VENTILATION IN TRANSIT.

Denial of new trial in action against carrier for damage to gladiolus bulbs in transit will not be reversed, where there

was competent evidence to sustain jury's finding that bulbs were damaged by lack of ventilation in transit, as claimed by plaintiff, rather than that bulbs were diseased when shipped, as claimed by defendant.

10. New Trial—Discretion of Court—Weight of Evidence.

Generally, the granting of a new trial rests on the sound discretion of the trial court and only where the verdict is against the clear weight of the evidence will a new trial be granted.

11. Carriers—Negligence—Mitigation of Damages.

One claiming damages to a commodity by reason of a carrier's negligence has a duty to take all reasonable steps to keep his damages at a minimum.

12. Damages—Mitigation—Question for Jury.

Whether or not plaintiff had taken steps to mitigate damages to 3 carloads of gladiolus bulbs was properly submitted as a question of fact to the jury under evidence presented and jury's verdict of $41,797.46 on a claim of $67,638.95 is evidence they considered the question of mitigation of damages.

13. Carriers—Proof of Loss.

Fact that no deposition of one of several shippers of gladiolus bulbs in Oregon was read in evidence did not preclude recovery for loss of bulbs shipped by him, where the invoice of bulbs covering his shipment was received and placed in evidence and there was testimony by the Oregon State inspector that such bulbs were in good condition when inspected.

14. Same—Perishable Commodities—Damage in Transit—Value.

The value of a shipment of a perishable commodity damaged in transit should be determined as of the time of arrival at destination and at that place.

15. Same—Damages—Evidence.

Damages awarded by jury to plaintiff which were less than the total of invoice of all gladiolus bulbs plus transportation cost was not error, where evidence showed condition of bulbs on arrival and cost of replacing same.

Appeal from Van Buren; Mosier (Carl D.), J. Submitted January 8, 1953. (Docket No. 48, Calendar No. 45,569.) Decided March 10, 1953. Rehearing denied April 16, 1953. Application for certiorari

filed in Supreme Court of the United States July 11, 1953.

Action by J. C. Van Lierop against Chesapeake & Ohio Railway Company, a Virginia corporation, for damage to gladiolus bulbs in shipment. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Jackson, Fitzgerald & Dalm* and *Ivan M. Wheeler,* for plaintiff.

*Anderson & Anderson, Norman F. Crawford* and *John J. Holden* (*William R. Althans,* of counsel), for defendant.

SHARPE, J.   This in an action for damages for failure to properly transport 3 carloads of gladiolus bulbs from Grants Pass, Oregon, to Hartford, Michigan.

The following are admitted facts:  In September, 1946, plaintiff, J. C. Van Lierop, a gladiolus bulb grower and dealer, of Hartford, Michigan, arranged at Grants Pass, Oregon, for the purchase and later shipment of gladiolus bulbs. The bulbs were loaded on cars and shipped in January and February, 1947. One car was loaded January 3, 1947, and released to the Southern Pacific Railway Company. Another car was loaded on January 6 and 7, 1947, and released to the Southern Pacific Railway Company. The third car was loaded February 11, 1947, and released to the Southern Pacific Railway Company. The first and second cars arrived in Hartford, Michigan, on January 16 and 17, 1947. The third car arrived in Hartford, Michigan, February 24, 1947. The bill of lading for the first car described "310 bags, gladiolus bulbs," bore the notations "SL & C," "standard ventilation," "carriers' protective service within heater territory," "shippers' specified service,

Rule 514 beyond." The bill of lading designated the Union Pacific Railroad Company and the Chicago & North Western Railway Company as intermediate carriers and the Chesapeake & Ohio Railway Company as terminating carrier.

The carriers participating in the movement of the second car were the same as those participating in the first and third cars, with the exception of the movement of the cars in Chicago. The uniform straight bill of lading covering the second car differs from those covering the first and third cars in that no reference is made on the bill of lading with respect to standard ventilation.

The bulbs were packaged in burlap bags and the bags were loaded in the cars in a manner to provide air channels between the bags for the purpose of providing ventilation. From the time the bulbs were shipped from Grants Pass, Oregon, until they reached Chicago, the bulbs were under so-called carriers' protective service and from Chicago, Illinois, to Hartford, Michigan, the bulbs were carried under shippers' specified service. When the bulbs arrived in Hartford, Michigan, some of them were in a damaged condition. On February 1, 1947, plaintiff wrote the Michigan State department of agriculture's bureau of plant industry for an annual inspection.

About 1 month after the first and second cars arrived, an inspection was made by the State inspectors. The State inspectors took 2 or 3 bushels of bulbs to Dr. Ray Nelson, research plant pathologist, at Michigan State College, for further examination. On July 10, 1947, plaintiff requested an inspection of all bulbs shipped. The State inspector, after an examination, condemned all the bulbs for disease: "Bulbs, 90% are very rotten; penicillium, fusarium, and so forth." The cause came on for trial, and at

the close of plaintiff's testimony, defendant made a motion for a verdict of no cause of action, for the reason that there was no competent evidence showing arrival of the bulbs in an improper condition, and no evidence from which the jury could arrive at a verdict as to the amount, other than by pure guess and speculation.

The trial court denied defendant's motion. The jury was requested to answer the following special questions: "Do you find that the bulbs in question were damaged by freezing or frost in transit?"; "Do you find that the bulbs in question were damaged by artificial overheating in transit?"; "Do you find that the bulbs in question were diseased when shipped?"; "Do you find that the bulbs in question were damaged by lack of ventilation in transit by reason of the negligence of the carrier?". The jury returned a verdict for plaintiff, in the amount of $41,797.46 and answered "no" to the first 3 questions and "yes" to the fourth question. Defendant appeals. We shall first discuss the correctness of the trial court's ruling on defendant's motion for a directed verdict. In doing so it will be necessary to summarize the evidence offered by plaintiff at the time the motion was made, as well as the theory upon which the case was brought.

In the case at bar, the transportation of the bulbs from Oregon to Michigan is interstate commerce, and is governed by the provisions of the interstate commerce act.* The following section of the act reads as follows:

"Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State * * * to a point in another State, * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property

---

* 49 USCA, § 1 *et seq.*—REPORTER.

caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass   *   *   *   when transported on a through bill of lading;   *   *   *   and any such *   *   *   railroad   *   *   *   so receiving property for transportation from a point in one State   *   *   * to a point in another State   *   *   *   railroad   *   *   * delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such   *   *   *   railroad   *   *   *   to which such property may be delivered or over whose line or lines such property may pass within the United States   *   *   *   when transported on a through bill of lading." 49 USCA, § 20, subd 11.

By virtue of the above act, the receiving carrier of an interstate shipment of goods for transportation issues a through bill of lading, although the place of destination is on the line of another carrier. Such a bill of lading is both a receipt and contract of carriage and delivery. See *L. E. Fosgate Co.* v. *Atlantic Coast Line R. Co.*, 263 Mass 192 (160 NE 783). In the case at bar, the bill of lading carried the instructions "carriers' protective service." This service is compulsory within heater territory on shipments originating in heater territory from November 16th to March 1st.

Carriers' protective service was contracted for between Oregon and Chicago and is defined as follows:

"Carriers' protective service means that the carrier will protect the shipment within the heater territory (see Rule 500) against frost, freezing or artificial overheating, furnishing, if necessary, arti-

ficial heat, or such other protective service as may be necessary to obtain that result."

Shippers' specified service was contracted for between Chicago, Illinois, and Hartford, Michigan, and is defined as follows:

"Shippers' specified service means that protection against frost, freezing, or artificial overheating will be supplied by use of heaters furnished, installed, and serviced by carriers as directed by shipper, in accordance with the provisions and charges published in Rules 513, 514, 516, 519, 526 or 527."

Under carriers' protective service, no instructions could be given the carrier as to manner of handling the cars while in heater territory. The cars were completely in the control of the carriers' protective service. It was the duty of the carrier to set a standard of care necessary for the transportation of perishable commodities. When a shipment passed beyond heater territory, it was handled under standard ventilation, unless the shipper, owner or consignee filed specific instructions to the contrary.

At the conclusion of plaintiff's case, there was evidence that the bulbs were in good and proper condition for shipment when received by the initial carrier at Grants Pass, Oregon. This evidence was supplied by some of the growers of the bulbs, the Oregon State inspector, and by a person who loaded the cars. There was evidence that the bulbs were loaded in the cars in burlap bags, a customary container for shipment, and were loaded in the cars in a manner to provide air channels between the bags, a customary practice in the loading of refrigerator cars in shipment of gladiolus bulbs; that the bags of bulbs were all labeled with tags showing the shipper's name, the variety of bulbs, the grade or size of bulbs and the number of bulbs in each sack. There, also, was evidence that when the bulbs ar-

rived in Hartford, Michigan, they were not in good condition and not fit for sale or planting, by reason of the fact that some of the bulbs were rooting, some were sprouting, were matted together and the bags wet; that upon arrival at Hartford, Michigan, the temperature inside the cars was 90 to 100 degrees; that steam rolled out of the cars when they were opened; the inside walls and ceiling of the cars were dripping wet; and that bulbs will break their dormancy when there is moisture present at a temperature of 40 to 45 degrees.

It is the general rule that in actions brought against a common carrier for damages for injury to goods, while in transportation, where specific acts of negligence have been alleged, the burden of proof is upon plaintiff to prove the negligent acts and that such acts caused the damage alleged. See *Chesapeake & Ohio R. Co.* v. *Thompson Manfg. Co.*, 270 US 416 (46 S Ct 318, 70 L ed 659), and *Atlantic Coast Line R. Co.* v. *Georgia Packing Co.*, 164 F2d 1.

In the case at bar, no specific acts of negligence were alleged. The action is founded upon contract. In such cases, the presumption that the damage was caused by the negligent acts of the carrier is raised upon a showing by plaintiff that the goods were delivered to the initial carrier in good condition and received at its destination in a damaged condition. In our opinion, plaintiff made a prima facie case. The trial court was not in error in denying defendant's motion for a directed verdict.

Defendant also urges that the trial court was in error in instructing the jury as follows:

"From Grants Pass, Oregon, to Chicago, Illinois, the cars in question were under the so-called carriers' protective service, which means that the carriers were to protect the shipment against frost, freezing, or artificial overheating, furnishing if necessary, artificial heat and ventilation or such other

protective service as might be necessary to obtain that result."

Defendant urges that furnishing of ventilation in connection with carriers' protective service is prohibited by tariff and that the words "and ventilation" are not included in the definition of carriers' protective service.

Under carriers' protective service, plaintiff as shipper had no right to give any instructions in regard to ventilation. Under carriers' protective service, the bulbs were entirely under the control of the carrier.

It is plaintiff's claim that it was the carrier's duty to see that the bulbs were properly ventilated at the proper times and places. We note that neither the definition of carriers' protective service, nor the definition of shippers' specified service makes any mention as to ventilation, although both items concern the protection of shipment of perishable commodities against frost, freezing or artificial overheating. Under carriers' protective service, the shipper was not allowed to specify the type of ventilation, while under shippers' specified service, the carrier will protect the shipment within heater territory against frost, freezing or artificial overheating. In *Southern Pacific Company* v. *Itule,* 51 Ariz 25 (74 P2d 38, 115 ALR 1268), it was held to be the carrier's duty to handle a shipment in a reasonably prudent manner as to all matters not covered by instructions. In our opinion, the duty to transport the bulbs without negligence was upon the carrier. Under the weather conditions existing at the time of the shipments, ventilation or artificial heat was necessary in order that the bulbs could have a degree of temperature that would not cause freezing or overheating. It follows that the instruction given by the trial court was not an erroneous instruction.

It is also urged that the verdict of the jury is contrary to the great weight of the evidence. This issue was raised by defendant in its motion for a new trial and is properly before our Court for review. In doing so, we shall relate the facts upon which defendant relies; that the 3 shipments of bulbs were forwarded from Grants Pass, Oregon, January 3, 1947, January 7, 1947, and February 11, 1947, and arrived at Hartford, Michigan, January 16, January 17 and February 24, 1947; that all cars were equipped with fans designed to circulate the air inside the cars; that the fans received their motive power from the car wheels and operated only while the cars were in motion; that the outside temperature varied from 10 degrees to 46 degrees; that the highest degree of temperature inside the cars was 47 degrees; that the inspection of the bulbs by the Oregon State inspector was conducted 2 months prior to the date of shipment; that the better way to ship bulbs is in boxes and not in bags; that about a month after the first shipment arrived, an inspector for the State of Michigan found various diseases in the bulbs shipped in the first 2 cars and that from 2 to 4% of the bulbs were so afflicted, and that from 96 to 98% of the bulbs could have been sold at that time at the regular market price; that Dr. Nelson, Research Plant Pathologist at Michigan State College, found no evidence of freezing or overheating, but did find diseases that could be the result of failure to remove sufficient moisture prior to shipment; that the bulbs were again inspected in July, 1947, by a State inspector who condemned all bulbs.

Dr. Nelson testified in substance:

A gladiolus bulb that has not been properly cured, insufficient moisture having been taken out, would be especially subject to decay by various types of bulb rot. We teach our growers that the most essen-

tial thing to do after harvest is to get moisture out of it immediately by artificial heat because if they do that, get the water out of it, you cannot make a bulb rot no matter what you do to it. A properly cured bulb is no longer susceptible to decay in storage. These bulbs were not properly cured; they had excess moisture, very moist. They were covered with fusarium smear. There was a lot of decay in them which only develops in bulbs improperly cured. If in a bag where bulbs were moist on the surface root action would start quickly. Bulbs improperly cured and moist in burlap bags will start to root at a low temperature. If improperly cured they would have more moisture on the surface. An improperly cured bulb would be inclined to sweat.

The evidence in this case narrows down to lack of ventilation in transit or diseased bulbs when shipped. The jury found as a fact that the bulbs were damaged by lack of ventilation caused by the negligence of defendant. It is the general rule that the granting of a new trial rests on the sound discretion of the trial court. It is only in cases where the verdict is manifestly against the clear weight of the evidence that a new trial will be granted. See *Foster* v. *Rinz,* 202 Mich 601; and *Wright* v. *Dwight,* 209 Mich 678. In our opinion there was competent evidence on the issues involved that should be considered by a jury. In such cases we do not reverse the trial court because of claimed weight of evidence.

It is also urged that plaintiff failed in his duty to mitigate his damages. It is the rule that plaintiff had a duty to take all reasonable steps to keep his damages at a minimum. See *Sauer* v. *McClintic-Marshall Construction Co.,* 179 Mich 618. In the case at bar, plaintiff testified that as the bulbs from the first and second cars were unloaded from the cars, they were taken out of the sacks and placed in storage in plaintiff's warehouse; that upon ar-

rival of the third car, the bulbs were stored in the warehouse for the reason that they were not fit for sale or planting; that from the time of arrival there was a gradual deterioration in the bulbs; that a few damaged bulbs in a tray would not contaminate or affect the other bulbs and that the condition of the bulbs in July, when they were dumped, was the result of the condition of the bulbs at the time they were received. In our opinion, the evidence supplied by plaintiff was sufficient to present a question of fact for the jury. The fact that the jury awarded plaintiff a verdict of $41,797.46, on a claim of $67,-638.95, is some evidence that the jury considered the question of mitigation of damages.

It is also urged that the verdict and judgment is excessive. One of the defendant's claims, in connection with this issue, is that plaintiff did not establish any right to recover for bulbs purchased from or shipped by Fred Varner, as no deposition for Varner was read in evidence. It appears that the invoice of the bulbs shipped by Varner was $1,413. It also appears that the invoice covering the shipment by Varner was received and placed in evidence. There was testimony by a State inspector of Oregon that the bulbs of Varner were in good condition when inspected. It appears that the total invoice of all bulbs was the sum of $40,-268.39, and the cost of freight paid was the sum of $2,023.49, or a total cost to plaintiff in the sum of $42,291.88. The verdict returned was less than this amount, namely, the sum of $41,797.46. There was evidence that in order to replace these bulbs at Hartford, Michigan, plaintiff would have to resort to a wholesale market at Hartford, Michigan. It also appears that from the time the bulbs arrived until they were discarded, there was no place in Hartford, Michigan, where other bulbs could be purchased.

In *Loveland & Hinyan Co.* v. *Waters,* 192 Mich 680, 682, we said:

"The rule of damages in cases of delayed transportation where the elements of falling markets and deterioration of the property are involved was recently restated by this Court in *Lyons* v. *Grand Trunk R. Co. of Canada,* 185 Mich 417. It was there said:

" ' "Where there is a delay for which the carrier is liable, the measure of damages is the difference between the market value of the property at the time and place at which the delivery should have been made and the same value when delivery was actually made, whether the difference in value was the result of a decline in the market, or of an injury suffered by the goods in consequence of the delayed delivery." 5 Am & Eng Enc Law (2d ed), p 384.' "

There was evidence that the market price of bulbs in Hartford, Michigan, at the time in question, was identical with what he was selling bulbs according to his price list. The jury found that the bulbs were damaged by reason of defendant's negligence. Their value should be determined at the place of destination at the time of arrival. There was evidence before the jury for their consideration as to the condition of the bulbs upon arrival and the cost of replacing same. Their verdict is not in excess of plaintiff's damages, as shown by testimony offered by plaintiff.

We find no reversible error and the judgment is affirmed, with costs to plaintiff.

DETHMERS, C. J., and ADAMS, BUTZEL, CARR, BUSHNELL, BOYLES, and REID, JJ., concurred.