**W. D. LAWSON & COMPANY and Washington General Insurance Company, Plaintiffs-Appellees,**

v.

**PENN CENTRAL COMPANY and Fort Worth & Denver Railway Company, Defendants-Appellants.**

No. 71–1357.

United States Court of Appeals, Sixth Circuit.

Feb. 29, 1972.

------

Caruthers Ewing, and J. Martin Regan, Memphis, Tenn., for appellants; Laughlin, Garthright, Halle & Regan, Memphis, Tenn., of counsel.

Newton P. Allen, Memphis, Tenn. (J. Kirby Riffel, Memphis, Tenn. on the brief), for appellees; Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., of counsel.

Before WEICK and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

EDWARDS, Circuit Judge.

This is an appeal from a judgment after jury trial entered by the United States District Court for the Western District of Tennessee (Western Division). The judgment against the two defendant railroads was in the amount of $13,206. It resulted from the nearly total destruction of 110 bales of cotton shipped by plaintiff from Texas to Massachusetts as a result of a fire in defendant Penn Central's yard in Cleveland, Ohio. Defendant Fort Worth and Denver was the initial carrier and issued its bill of lading, while Penn Central was the delivering carrier. Neither railroad operates a line of railroad in Tennessee, but both have offices and agents in Memphis, as does the plaintiff.

Plaintiff brought this suit in the Circuit Court in Shelby County, Tennessee, alleging liability in two counts—the first a common law count and the second a statutory count under the Carmack Amendment (49 U.S.C. § 20(11) (1970)). Both defendants removed the case to the United States District Court specifically reserving their objections to venue. The District Judge denied defendants' motions to dismiss except as to the Carmack Amendment count against Penn Central. The jury found for plaintiff on a common law count and the Carmack Amendment count against Fort Worth and Denver, and on the common law count against Penn Central.

On these simple and undisputed facts appellants state three issues:

1) The law in Tennessee is that the nonresident defendant corporations were not subject to suit in Tennessee.

2) The federal law has preempted the field of law relating to shipment of goods by interstate carriers.

3) To allow this suit in Tennessee against these appellants constitutes an unreasonable burden on interstate commerce.

As to the first issue posed, the District Judge held:

"This court is of the opinion that the defendants are subject to service of process in the State of Tennessee by virtue of TCA 20–218. Atchison, Topeka & Santa Fe Railroad Co. v. Ortiz, 50 Tenn.App. 317 [361 S.W.2d 113] (1962). TCA 20–220, a separate service of process provision pertaining to foreign corporations is inapplicable to this case. That section is to be distinguished from TCA 20–218. Cumberland Tel. & Tel. Co. v. Turner, 88 Tenn. 265, [12 S.W. 544] (1898). The defendants rely upon Delaney Furniture Company v. The Magnavox Company, [222 Tenn. 329], 435 S.W.2d 828 (Sup.Ct.Tenn.1968). In the *Delaney* opinion the Supreme Court was considering TCA 20–220 and not TCA 20–218. This court is of the opinion

that service of process upon both defendants is valid."

This issue is anything but simple and would require considerable discussion but for the fact that we have recently decided a closely parallel case. Beautytuft, Inc. v. Factory Insurance Assoc., 431 F.2d 1122 (6th Cir. 1970). The principal issue in *Beautytuft*, as in this case, was whether the courts of Tennessee are open to adjudicate disputes arising outside the boundaries of Tennessee between associations and corporations which have offices and agents available for service in personam within the state of Tennessee.

As we recognized in *Beautytuft*, Tennessee statute T.C.A. § 20–220 (1955) provides for substituted service on corporations doing business in Tennessee on statutorily designated agents who would not normally be held to be corporate agents. This statute also limits suits thus commenced to suits pertaining to causes of action which arise within the boundaries of Tennessee. Tennessee, however, historically has belonged to the group of states which open their courts to suits by their citizens against each other, even though the locus of the cause of action is entirely outside of the forum state. The narrow issue in this case is whether Tennessee law would treat two foreign corporations, which are subject to service because they have offices and do business in Tennessee, like Tennessee citizens who can sue each other in Tennessee courts in relation to a cause of action arising wholly outside of Tennessee's boundaries.

Two Tennessee judges familiar with Tennessee law, Judge Wilson in the *Beautytuft* case, and Judge McRae in the instant case, both thought the Tennessee courts were open to such suits. They relied upon the fact that the Tennessee legislature in authorizing service on associations in T.C.A. § 20–223 (1955), and in authorizing service on corporations with offices in Tennessee

in T.C.A. § 20–218 (1955), did not see fit to include the limitation contained in T.C.A. § 20–220 (1955).

This likewise is the view of the Tennessee Court of Appeals, as expressed in Atchison, Topeka & Santa Fe R. Co. v. Ortiz, 50 Tenn.App. 317, 361 S.W.2d 113 (1962). We recognize, of course, that we here construe Tennessee law and that there is force to appellants' argument that the Supreme Court of Tennessee may hold that the limitation contained in T.C.A. § 20–220 should be read into such service of process statutes as T.C.A. § 20–223 and T.C.A. § 20–218.

Since nothing suggesting that the Tennessee legislature intended this result is presented to us here (or was in *Beautytuft*) and pending final adjudication on this point in the Supreme Court of Tennessee, we now adhere to our views as fully expressed in *Beautytuft*, *supra*.

As to the second issue posed by this appeal concerning whether or not the Carmack Amendment preempted common law suits of the nature of the first count stated in this case against both appellants, we hold that it did. We have read the first count as stated in appellees' original state court declaration and find that it is a suit for damages for violation of appellants' common carriers contract for interstate carriage of goods.[1] We perceive no distinction between the nature of this count, or the relief sought thereunder, and that stated or sought under the federal statute.

In Adams Express Co. v. Croninger, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913), the Supreme Court by unanimous decision dealt at length with the Carmack Amendment proviso which is relied upon here to sustain the common law counts. Its holding was:

"Prior to that amendment the rule of carrier's liability, for an interstate shipment of property, as enforced in

1. *But see* Marks Manufacturing Co. v. N. Y. Central R. Co., 448 F.2d 68 (6th Cir. 1971), concerning carrier liability in an *intrastate* transportation case.

both Federal and state courts, was either that of the general common law as declared by this court and enforced in the Federal courts throughout the United States, Hart v. Pennsylvania Railroad [Co.], 112 U.S. 331, [5 S.Ct. 151, 28 L.Ed. 717]; or that determined by the supposed public policy of a particular State, Pennsylvania Railroad [Co.] v. Hughes, 191 U.S. 477, [24 S.Ct. 132, 48 L.Ed.2d 268]; or that prescribed by statute law of a particular state, Chicago [etc] Railroad v. Solan, 169 U.S. 133, [18 S.Ct. 289, 42 L.Ed. 688].

"Neither uniformity of obligation nor of liability was possible until Congress should deal with the subject. The situation was well depicted by the Supreme Court of Georgia in Southern Pacific Co. v. Crenshaw [Bros.], 5 Ga.App. 675, 687, 63 S.E.Rep. 865, where that court said:

'Some States allowed carriers to exempt themselves from all or a part of the common-law liability, by rule, regulation, or contract; others did not; the Federal courts sitting in the various States were following the local rule, a carrier being held liable in one court when under the same state of facts he would be exempt from liability in another; hence this branch of interstate commerce was being subjected to such a diversity of legislative and judicial holding that it was practically impossible for a shipper engaged in a business that extended beyond the confines of his own State, or for a carrier whose lines were extensive, to know without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actual responsibility as to goods delivered to it for transportation from one State to another. The congressional action has made an end to this diversity; for the national law is paramount and supersedes all state laws as to the rights and liabilities and exemptions created by such transaction. This was doubtless the purpose of the law; and this purpose will be effectuated, and not impaired or destroyed by the state court's obeying and enforcing the provisions of the Federal statute where applicable to the fact in such cases as shall come before them.'

"That the legislation supersedes all the regulations and policies of a particular State upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the State upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist. Northern Pacific Ry. [Co.] v. State of Washington, 222 U.S. 370, [32 S.Ct. 160, 56 L.Ed. 237]; Southern Railway [Co.] v. Reid, 222 U.S. 424, [32 S.Ct. 140, 56 L.Ed. 257]; [Second Employers' Liability Cases] Mondou v. Railroad, 223 U.S. 1, [32 S.Ct. 169, 56 L.Ed. 327].

"To hold that the liability therein declared may be increased or diminished by local regulation or local views of public policy will either make the provision less than supreme or indicate that Congress has not shown a purpose to take possession of the subject. The first would be unthinkable and the latter would be to revert to the uncertainties and diversities of rulings which led to the amendment. The duty to issue a bill of lading and the liability thereby assumed are covered in full, and though there is no reference to the effect upon state regulation, it is evident that Congress in-

tended to adopt a uniform rule and relieve such contracts from the diverse regulation to which they had been theretofore subject.

"What is the liability imposed upon the carrier? It is a liability to any holder of the bill of lading which the primary carrier is required to issue 'for any loss, damage or injury to such property caused by it,' or by any connecting carrier to whom the goods are delivered. The suggestion that an absolute liability exists for every loss, damage or injury, from any and every cause, would be to make such a carrier an absolute insurer and liable for unavoidable loss or damage though due to uncontrollable forces. That this was the intent of Congress is not conceivable. To give such emphasis to the words, 'any loss or damage,' would be to ignore the qualifying words, 'caused by it.' The liability thus imposed is limited to 'any loss, injury or damage caused by it or a succeeding carrier to whom the property may be delivered,' and plainly implies a liability for some default in its common law duty as a common carrier.

"But it has been argued that the non-exclusive character of this regulation is manifested by the proviso of the section, and that state legislation upon the same subject is not superseded, and that the holder of any such bill of lading may resort to any right of action against such a carrier conferred by existing state law. This view is untenable. It would result in the nullification of the regulation of a national subject and operate to maintain the confusion of the diverse regulation which it was the purpose of Congress to put an end to.

"What this court said of § 22 of this act of 1906 in the case of Texas & Pac. Ry. [Co.] v. Abilene Cotton Mills, 204 U.S. 426, [27 S.Ct. 350, 51 L.Ed. 553] is applicable to this contention. It was claimed that that section continued in force all rights and remedies under the common law or other statutes. But this court said of that contention what must be said of the proviso in § 20, that it was 'evidently only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the Interstate Commerce Act, or by state statute, or common law, not inconsistent with the rules and regulations prescribed by the provisions of this act.' Again, it was said, of the same clause, in the same case, that it could 'not in reason be construed as continuing in a shipper a common-law right the existence of which would be inconsistent with the provisions of the act. In other words, the act cannot be said to destroy itself.'

"To construe this proviso as preserving to the holder of any such bill of lading any right or remedy which he may have had under existing Federal law at the time of his action, gives to it a more rational interpretation than one which would preserve rights and remedies under existing state laws, for the latter view would cause the proviso to destroy the act itself." Adams v. Croninger, *supra* at 504–508, 33 S.Ct. at 151.

This case has been repeatedly cited and followed for the preemption doctrine for which we have cited it. New York, N. H. & H. R. Co. v. Nothnagle, 346 U.S. 128, 131, 73 S.Ct. 986, 97 L.Ed. 1500 (1953); Missouri P. R. Co. v. Porter, 273 U.S. 341, 345, 47 S.Ct. 383, 71 L.Ed. 672 (1927); St. Louis, I. M. & S. R. Co. v. Starbird, 243 U.S. 592, 595, 37 S.Ct. 462, 61 L.Ed. 917 (1917); Gold Star Meat Co. v. Union P. R. Co., 438 F.2d 1270, 1272 note 1 (10th Cir. 1971); American Synthetic Rubber Corp. v. Louisville & N. R. Co., 422 F.2d 462 (6th Cir. 1970).

■ The District Court erred in failing to dismiss the common law counts as to both appellants. Since he properly dismissed the Carmack Amendment

count as to appellant Penn Central on the ground that a receiving carrier could not be sued under the specific language of the Carmack Amendment in a state where it did not operate a line of railroad, our preemption holding requires vacation of the judgment as to appellant Penn Central and remand for dismissal of the complaint as to it.[2]

■ As to appellant Fort Worth and Denver, the District Court had jurisdiction under the Carmack Amendment and in view of the practical identity of the two counts, we hold its error in submitting the common law count to the jury was harmless. FED.R.CIV.P. 61.

■ We see little merit to appellants' third argument pertaining to the claim that suit in the Tennessee courts imposed an unreasonable burden on interstate commerce. As we have held, all parties maintained offices in the state and county where the suit was filed. The Carmack Amendment allowed this suit to be brought against the remaining appellant, Fort Worth & Denver, in many jurisdictions where the convenience of the parties would be no better served than they were in Memphis. If, indeed, it had been brought in the jurisdiction most logical from the point of view of the Carmack Amendment, namely, Texas, where the bill of lading was issued, the inconvenience in terms of witnesses from Ohio would have been considerably greater than it was in Tennessee.

The judgment of the District Court is vacated as to appellant Penn Central and affirmed as to appellant Fort Worth & Denver.

2. Note, however, that Title 49 § 20(12) gives appellant Fort Worth & Denver as the carrier which issued the bill of lading a right to recover what it is required to pay from the common carrier "on whose line the loss, damage, or injury shall have been sustained."