SCHRIER v FRENCH

1. CONTRACTS—PARTIES—BREACH—PERFORMANCE.

A party to a contract is not obligated to perform further when he is certain that the other party has breached the contract.

2. CONTRACTS—PARTIES—DAMAGES—BREACH—MITIGATION.

A party to a contract who could have taken action to avoid increased damages caused by the other party's breach cannot be heard to complain that he was damaged by the breaching party where the first party failed to take action and permitted a bad situation to get worse; a party's failure to mitigate damages may act as a bar preventing his recovery of damages from the other party.

3. APPEAL AND ERROR—FINDINGS OF FACT—WITNESSES—DEMEANOR— CREDIBILITY.

The Court of Appeals, in reviewing a trial court's findings of fact, gives considerable weight to the fact that the trial court has had the opportunity to observe the witnesses, and the manner in which they testified, and to judge their credibility.

4. TRIAL—TRIAL JUDGES—DEPOSITION AS EVIDENCE—DEFENDANT'S OWN TESTIMONY.

A defendant's claim that the trial judge improperly considered a deposition in determining a question of fact was groundless where it was obvious that the trial judge based his findings of fact upon that defendant's own testimony at the trial and not upon the deposition.

5. EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY.

Photographs are admissible in evidence if they are helpful in illuminating any material point in issue.

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 365, 425–430, 442, 443, 447.
[2] 17 Am Jur 2d, Contracts §§ 441–447, 521.
[3] 5 Am Jur 2d, Appeal and Error § 884.
[4] 76 Am Jur 2d, Trial §§ 1250–1270.
[5] 29 Am Jur 2d, Evidence §§ 783–787.

Appeal from Van Buren, Robert E. A. Boyle, J. Submitted February 11, 1976, at Lansing. (Docket No. 21953.) Decided March 8, 1976.

Complaint by Harold D. Schrier against Paul C. French, Jr., and Betty Lou French, individually and doing business as French Farms, for an accounting and for damages for a breach of contract. Defendants counterclaimed against the plaintiff for sums due on the contract and other sums of money on *quantum meruit* for services rendered and for an accounting. Pearl Grange Fruit Exchange, Inc., was joined as intervening counter-defendant on the counterclaim. American National Bank and Trust Company intervened as a party plaintiff to protect its security interest in certain feeder pigs. Defendants joined the intervening plaintiff as a defendant on the counterclaim alleging that intervening plaintiff had acted in concert with the plaintiff to defraud defendants. The bank was later dismissed by stipulation. Judgment dismissing both the complaint and counterclaims. Defendants appeal. Plaintiff and intervening counter-defendant cross appeal. Upon the accidental death of plaintiff while the appeal was pending, Frances L. Jensen, Administratrix of the Estate of Harold D. Schrier, was substituted in his place. Affirmed.

*Wickett, Erickson & Beach, P. C.,* for plaintiff and intervening counter-defendant.

*Leo W. Hoffman,* for defendants.

Before: D. E. HOLBROOK, JR., and D. E. HOLBROOK and T. M. BURNS, JJ.

D. E. HOLBROOK, J. In this case plaintiff sued the

defendants for breach of a contract, for an accounting and damages. Defendants counterclaimed against plaintiff claiming sums due on the contract and other sums of money based on *quantum meruit* for services rendered the plaintiff and an accounting.

Testimony was presented by both plaintiff and defendants, including testimony from expert witnesses. Various exhibits and depositions were also admitted into evidence. The transcript of the testimony comprises 1,634 pages.

The trial court found that plaintiff was not entitled to any relief and dismissed plaintiff's complaint, and also found that defendants were not entitled to any relief and dismissed their counterclaim. We have reviewed the record and believe the trial court succinctly and properly stated the facts and decided the issues before him, and which are now raised on appeal before us. We incorporate part of Judge Boyle's opinion in this opinion, *viz:*

"This court does not consider it necessary to set forth the facts in great detail. The facts deemed necessary to decision are as follows: Plaintiff Harold D. Schrier, who will be hereinafter referred to as Schrier, resides and has his office for his firm of petroleum waxes and chemicals in the City of Kalamazoo. During a period between 1964 and 1967 he purchased three farms in Van Buren County known as Red Bird Farms and devoted the farms to the raising of swine, which business was carried on by his then wife, Colleen Schrier. In early 1969, defendant Paul C. French, Jr., who will hereinafter be referred to as French, met Schrier at a gathering at the home of some friends. Schrier's version of it is that French 'barged in' on them for the purpose of insinuating himself into the good graces of Schrier so that he could become associated with him in a swine raising and marketing operation, using Schrier's substantial financial resources. French denies Schrier's

version and says that he was introduced to Schrier and shortly thereafter there was a discussion between them about becoming associated together in a pig raising operation, with Schrier, who French claims represented himself to be worth over $2,000,000, to furnish the financing and French to furnish the expertise in overseeing and managing the venture.

"In any event, after preliminary discussions, written proposals that were claimed to become the contract between the parties were drawn up and after much discussion and negotiation, were in certain respects adopted as the basis for their carrying on the operation. Schrier claims the terms agreed upon were as he claimed and French contends they were as he claimed throughout the case.

"It is Schrier's claim that French represented himself as being widely experienced in swine raising; that he had an operation proceeding on his own property near Bangor and at other points in Van Buren County; and that he also had a feed mill which he used to feed the animals that were raised in the operation so that they could be fattened for market. There apparently is no dispute about this representation. Incidentally, French's wife was joined more or less as a nominal defendant, and to join in the counterclaims. The final ruling in this opinion also applies to her.

"According to their agreement, despite the dispute between them as to what the exact terms were, it is undisputed that French was to build a number of buildings for the extensive pig raising and marketing operation planned, which buildings included facilities for breeding, gestation, farrowing, and finishing. It was contended by Schrier that there was a budget agreed upon which was to cover construction and the furnishing of stock. After the operation was in progress, it was contemplated that the venture would support itself as well as make generous profits for Schrier—and that French would also profit therefrom.

"Schrier contended that French, who claimed to have expertise in pig raising business as well as being able to employ a staff of men that could properly run the operation, actually had no knowledge of the business and that he employed inexperienced and incompetent

workmen who not only knew little about construction but little about the raising and care of the animals. Schrier further contended that instead of keeping the expenditures within the agreed upon budget of about $225,000, French exceeded said budget until the expenditures approached a half million dollars—twice the amount of the budget agreed upon; that even after this expenditure in a period of months, that the construction of the buildings was not completed; that whatever was constructed was done in a poor and unworkmanlike manner so that the animals could not be properly housed and cared for; that the surroundings around the area where the pigs were located were permitted to get into deplorable condition, particularly with respect to the disposition of dead pigs, and the care of equipment and feed, until Schrier notified French that he was terminating the agreement and would give French no more money. This was done late December 1969 and January 1970, at which time Schrier set forth in detail how he claimed French breached the agreement.

"French on his part contends that the agreement was not as Schrier claimed; that he did have extensive knowledge in the raising of pigs; that he had an adequate and trained staff of workmen to do the construction and the supervision of the operation; that among the reasons that the buildings were behind schedule and that certain conditions existed at the location of the pig raising operation was because subcontractors did not fulfill their agreements with him, that Schrier was constantly interfering and changing whatever plan of action that French had; that Schrier did everything he could to impede and obstruct French in the fulfillment of his contract, and that Schrier had no reason for terminating the contract. As a result of the dispute, Schrier filed suit against French in the Circuit Court for the County of Van Buren on January 28, 1970 asking for a restraining order against French with respect to exercising any of French's alleged rights or duties as manager of Red Bird Farms, or enforcing his alleged lien against the swine (it appears that French had filed an agister's lien) as well as other liens against the property for an accounting and for damages.

"French counterclaimed and besides bringing in his

claim against Schrier, joined as a defendant on the counterclaim the American National Bank and Trust Company of Michigan, which has its main office in Kalamazoo, Michigan, alleging that that bank had in concert with Schrier made misrepresentations as to Schrier's financial position which induced French to terminate all of his other income producing endeavors to become associated with Schrier to his damage of several million dollars for which French demanded judgment. Parenthetically, the case against the American National Bank and Trust Company was dismissed by stipulation.

"After the filing of the suit and the counterclaim, a restraining order was issued, and thereafter receivers were appointed by the Circuit Judge for the County of Van Buren. These receivers were attorney Douglas J. McKinder, associated with the law firm who represented French; and attorney Richard K. Burnham, associated with the law firm representing Schrier. In the order for the receivership, there was a provision that French should be employed by the receivers as manager of the pig raising operation during the course of the receivership.

\* \* \*

"As indicated, the case finally came on for trial after preliminary motions and proceedings and many depositions. The court listened carefully to the testimony, observed the witnesses and their demeanor, took extensive notes and examined the many exhibits carefully. This examination of exhibits required many hours of this court's time because of the somewhat confused condition of them. As indicated, the parties were somewhat less than models of candor in their testimony. It was necessary for the court to make inquiry at various intervals in the proceedings in order to obtain as much enlightenment as possible so that the matter could be intelligently considered. Accordingly, the court finds the facts as follows:

"French's claim that he had extensive knowledge and was experienced in swine raising was not substantiated by events. At trial, he admitted that he had no personal experience in such but had merely read a few books

and had taken an extension course for a limited period of time. It became obvious to this court that French had nothing of the experience that he claimed and that he placed untrained and incompetent persons in charge of the operation. Among the plaintiff's exhibits were certain photographs admitted into evidence which reflect and confirm the incompetence of the persons placed in charge of the operation; that the buildings were improperly constructed in the interior so that the swine became injured as well as diseased; that they did not take proper care of the equipment or of the feed which was being furnished by French at claimed higher prices than could be purchased other places; and that the sanitation situation was atrocious.

"Some of the witnesses appearing at the trial were persons who French had retained to run the operation and it was obvious to this court that they had very little if any training; that they were incompetent; and that they could not keep the most elementary records. As an example, French placed in charge of recording feed, mortality and the type of illness that was affecting the pigs and at one point causing mortality, individuals who spelled staphylococcus as 'staff' and pneumonia as 'numonia' and one workman who could not even spell his own name. Instead of furnishing periodic reports to Schrier as originally agreed upon, French not only kept Schrier uninformed but apparently instructed these men to keep Schrier from observing what was going on under one pretext or another.

"French took advantage of Schrier's lack of knowledge of this type of business as well as Schrier's fear and anxiety about a tax problem related to another business in which Schrier was involved called Pearl Grange. It is to be noted that French, in his suit in claim against Schrier, demands $40,000 for accounting work in connection with obtaining a refund in connection with the Pearl Grange Company's tax problems. This court finds that from all the credible evidence that French had little to do with this; that his claims of hours spent were grossly exaggerated; and that he did not expect to be paid for anything that he did in connection with it; and that this claim was conjured up when he filed his counterclaim.

"With respect to Schrier's relief, his counsel says in his brief on page 12:

" 'It is plaintiff's contention that after discovering the breaches by the defendant, he could do either of two things. He could consider the contract as terminated and withhold his own performance, or he could have treated the contract as continuing and sue after its completion for the defective performance. (Simpson on Contracts, Hand Book, Chapter 18, Page 501.) After careful deliberation, the plaintiff decided to adopt the former course of action. The plaintiff decided to exercise the rule which is laid down in *Standard Transformer Co v City of Detroit,* 146 F Supp, 740–742 (1956), which states:

" ' "We hold that if one party is certain that the other party has breached * * * [its] contract, the former is not obligated to perform further." ' '

"The plaintiff's counsel said further in his brief at the bottom of page 29 and the top of page 30:

" 'This leaves the question as to what relief is the plaintiff entitled? Plaintiff, by Count I of his Amended Complaint prayed that defendant be required to account to the plaintiff. No such accounting was made, and based upon *what is apparently a complete dirth* (sic) *of records in the admitted possession of the defendants, probably plaintiff would be unable to obtain any meaningful accounting.'* (Emphasis supplied.)

"This court is of the opinion that plaintiff's foregoing evaluation of the questionable condition of the records and exhibits is correct. This court finds further that that and any other losses suffered by the plaintiff were caused in great measure by his own carelessness and negligence and failure to act in such a way that any damages caused by French would have been greatly minimized, if not entirely avoided.

"This is illustrated by the fact that despite Schrier's checking into the operation of French at French's farms before entering into association with French, which operation at the farms he found to be poor and minimal, still went into association with French and continued to furnish him money. It is also illustrated that despite supposedly terminating French's contract as

manager of the enterprise with Schrier, Schrier still gave him $15,000 in January of 1970 *at a time when Schrier was either suing or preparing to sue French.* (Emphasis in original.) With respect to the lack of candor to the court in their testimony, it is determined by the court in a study of the depositions that French had informed Schrier that he had a loan on some pigs from a bank which loan he was supposed to pay to the bank as the pigs were sold; that he sold the pigs without making the payments of the money to the bank, and that he was in trouble with the bank. At the trial French insisted that this money (given, as aforesaid after the expressed intention to terminate the contract by Schrier) was for payment on construction while Schrier insisted that it was given for advance feed. Neither told this court about the bank payments.

"It should be noted at this point that French admitted at the trial that he had not told the truth in his deposition as to who wrote the word 'construction' on one of the checks. This court finds that neither version at the trial, either by Schrier or by French, is credible. This court also finds Schrier directed the dating of the checks to be falsely entered so as to take an unjustified tax credit.

"Apparently on January 6, 1970, check #13940 (but dated on the check stub as '12/31/69') was made out to French Farms for $10,000, with the check stub notation FOR 'on account'. It was not made clear to the court what that meant.

"On 1/9/70, check #13949 was made out to French Farms for $5,000, with the check stub notation 'December 1969'.

"On 1/16/70, check #13972 was made out to Paul French for $660, with the check stub notation 'Inv. #865 40 Feeder Pigs'.

"This was the last check written.

\*    \*    \*

"At one point in his testimony at the trial (when his counsel repeatedly cautioned him about editorilizing when he testified) he was paritcularly nonresponsive in his answers. He continued being so for such a time that this court directed him to give a 'yes' or 'no' answer to

a specific question. Instead of complying with the directive of the court by 'Yes' or 'No', his answer was 'Sometimes'.

\* \* \*

"French testified that he formed a building company named Shur-Built in early summer of 1970. He said he did so after Schrier complained about his slowness in getting the construction of the facilities completed by Smiley. French terminated Smiley as contractor because as French testified he could control the subcontractors better and could purchase materials in a cheaper fashion after Schrier had asked him to do so in order to get the buildings constructed and completed. This court does not find such to be true. It is determined from other testimony and depositions that Shur-Built was not formed until sometime in October of 1970 and that French had used this organization to take other construction jobs when he was not even completing the buildings of the pig raising facility; and that he terminated the services of the construction firm named Smiley, so that French could use the funds Schrier intended for construction for some of French's own personal building ventures.

"As indicated, Schrier was guilty of contributing to his own losses and damages when he, as an experienced businessman, having observed how French was mishandling the whole operation should have terminated the situation a short time after it had started. He cannot now be heard to complain that he was damaged by French. *Harrington-Wiard Co v Blomstrom Mfg Co,* 166 Mich 276 [131 NW 559] (1911), *Sauer v McClintic-Marshall Construction Co,* 179 Mich 618 [146 NW 422] (1914), *Cutter v Powers,* 200 Mich 375 [166 NW 1029] (1918), *Van Keulen [& Winchester Lumber Co] v Manistee & Northeastern R Co,* 222 Mich 682 [193 NW 289] (1923).

"In other words, Schrier could have avoided any claimed increased damages caused by French when French's mismanagement came to his attention which was, according to the credible evidence and testimony, in the spring of 1969. Instead of taking action to get French out of the operation, including construction,

when he was aware of the inept way in which French was conducting the project, he stood by and permitted a bad situation to get worse. See *Rich v Daily Creamery Co,* 296 Mich 270 [296 NW 253] 1941), *Edgecomb v Traverse City Sch Dist,* 341 Mich 106 [67 NW2d 87] (1954), *Van Lierop v C & O R Co,* 335 Mich 702 [57 NW2d 431] (1953), *Januska v Mullins,* 329 Mich 606 [46 NW2d 398] (1951). See also 22 Am Jur 2d, Damages, § 33, p 56.

"Whether Schrier's failure to get French out should be termed failure to mitigate or minimize damages, or contributory negligence or the doctrine of avoidable consequences, in actual fact it appeared to this court to be plain disinterest or lack of concern. Schrier cannot now be heard to say he should have damages for what he apparently acquiesced in—or 'let it happen'.

"French testified on June 14, 1973 that in January 1970 he sold feeder pigs or swine belonging to Schrier receiving about $5,000 to $6,000 for them but kept the proceeds claiming he used it for feed. However, he admits in a statement of June 30, 1970, that he gave no credit to Schrier for the $5,000 to $6,000.

"French's claim that the contract by Schrier was unjustly terminated, thereby causing him to lose hundreds of thousands of dollars on the basis of his loss of prospective earnings if he had been retained as manager of the operation, this court finds to be without any merit whatsoever; that French was responsible in great measure for causing the failure of the operation and great financial losses; that he was in poor financial condition because of his overextended indebtedness at the time he entered into the association with Schrier; that it was Schrier's money that was being used and not French's; that even during the receivership, French mismanaged the operation causing it ultimately to close.

"This court is mindful of inquiring near the end of the trial if counsel for Schrier would not concede French was entitled to some compensation for manager during the receivership. French contended he had about $20,000 due him for those services. Plaintiff's counsel was reluctant so to concede. This court after review of the testimony and exhibits finds counsel was justified;

that French performed no better than before the receivership, and that he was usually requesting the receivers to make outlays of money that at that stage were unjustified. In one instance, he charged for vacation pay for a farm laborer in an operation that proceeded from day to day. This court finds French is entitled to nothing.

"This court finds that French, although requested many times to substantiate his invoices, did not do so and was paid money by Schrier when Schrier did not have to do so without the substantiation of the charges. This court finds further that French used his feed mill to his own advantage and obtained prices for feed that was not substantiated as to delivery and use. The court again notes that the persons that French employed to run the facility, who should have been supervised by French, damaged and wasted feed, while French was apparently spending his time elsewhere.

"This court is persuaded that if French honestly and in good faith believed he had any substantial amount of money due from Schrier at the time Schrier was terminating his association with French in January of 1970, French would not have merely said when Schrier told French on January 16, 1960 [sic] that he didn't owe French any money, 'Don't you owe me $660 for feeder pigs?' Incidentally, as aforesaid this court notes from examination of the exhibits that Schrier paid French the $660 (the only amount French then claimed owing him) by check #13972 dated January 16, 1970, drawn on the American National Bank of Kalamazoo. This payment also illustrates a position taken by Schrier that is difficult to reconcile with any claim of his for damages from French.

"This court finds from all of the credible evidence and testimony that Schrier did not arbitrarily, maliciously or improperly terminate the contract with French but that he did not sustain the burden of proof necessary to recover damages. This court further finds that French did not sustain the burden of proof necessary to obtain the relief he seeks or to recover damages against Schrier, and accordingly, his counterclaims are dismissed."

First, we recognize that the trial court had the opportunity to observe the witnesses, and the manner in which they testified, and to judge their credibility. This we give considerable weight to in reviewing the court's findings of fact. GCR 1963, 517.1, *Ford v Howard,* 59 Mich App 548; 229 NW2d 841 (1975).

Next, we determine that the defendant breached the contract and the breach was of such a nature as to justify termination of the same by plaintiff. This is in accord with the ruling in *Walker & Co v Harrison,* 347 Mich 630; 81 NW2d 352 (1957). We further rule that the trial court was correct in its finding that plaintiff failed to mitigate damages. But for such failure plaintiff would have been able to have obtained his judgment for damages from the defendant.

We further rule that the trial court was correct in finding that the defendants in their counterclaim failed to substantiate such claim in the trial of the case. We therefore rule that the answer is no to Issue I proposed in this case, *i.e.,* were the trial court's findings that defendant materially breached the contract, that plaintiff did not waive defendant's breach, that plaintiff failed to mitigate damages, that plaintiff neither conspired or commenced suit to destroy defendant's business and that defendant was not entitled to be compensated for his accounting services clearly erroneous?

As to Issue II, did the trial court err in admitting into evidence photographs depicting conditions on the farm taken within three days after defendant and his crew were removed from the premises and considering a deposition not admitted into evidence in reaching a decision?

The defendants claim that the trial judge considered the deposition of defendant French in deter-

mining a question of fact in the matter. This claim is erroneous. The transcript states the following:

"*Mr. Wickett: Q.* But you do admit it was you that added the word construction on the $10,000 check?

"*The Witness: A.* I admit it was my handwriting, it sure looks like it, I don't recall doing it, it sure looks like my handwriting, yes. I denied in the deposition signing it, but that's my handwriting."

It is obvious that the trial judge based his finding of fact upon the defendant's own testimony at the trial, not by admitting the deposition into evidence. As to the photographs, they were admitted to show the condition of the premises shortly after defendant was relieved of the control of the farm. Photographs are admissible if they are helpful in illuminating any material point in issue. *People v Midgyett,* 49 Mich App 663; 212 NW2d 754 (1973). In the instant case, the photographs merely illuminated plaintiff's testimony regarding the farm's condition when he gained possession. Any change in the key operation of the farm was fully explained and the trial judge was fully aware of the same.

Affirmed. No costs, neither party prevailing fully.